IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

| | | |
|---|---|---|
| KOVA COMMERCIAL OF NAPLES, LLC, | ) ) ) | |
| Plaintiff, | ) ) | **Case No. 2:23-CV-614** |
| V. | ) ) | |
| TODD SABIN, | ) ) | |
| Defendant. | ) ) | |

## VERIFIED FIRST AMENDED COMPLAINT AND JURY TRIAL DEMAND FOR INJUNCTIVE AND OTHER RELIEF, INCLUDING DECLARATORY JUDGMENT

Plaintiff KOVA Commercial of Naples, LLC ("KOVA" or "Company"), by and through its attorneys, Hunton Andrews Kurth LLP, hereby files this Verified First Amended Complaint and Jury Trial Demand for Injunctive and Other Relief, Including Declaratory Judgment ("Complaint") against Defendant Todd Sabin ("Defendant" or "Sabin") and alleges as follows:

## NATURE OF THE ACTION

1.    In this action for (a) breach of contract, (b) tortious interference with advantageous business relations, (c) breach of fiduciary duty, (d) violation of the Defend Trade Secrets Act of 2016, (e) violation of the Florida Uniform Trade Secrets Act, and (f) misappropriation of confidential information, KOVA seeks a declaratory

1

judgment, injunctive relief, and damages arising out of the use and misappropriation of KOVA's confidential and trade secret information by KOVA's former Managing/Qualifying Broker Todd Sabin to divert business away from KOVA, and his solicitation of KOVA's clients in violation of his contractual and fiduciary obligations to the Company.

2.    KOVA is a commercial real estate brokerage that operates primarily in Charlotte, Lee, and Collier Counties, Florida.

3.    From August 5, 2016 through August 4, 2023, Sabin was a Member of the Company and served as KOVA's Managing/Qualifying Broker.

4.    Sabin's position was one of significant trust and responsibility, and provided Sabin with access to extensive client, strategic, and trade secret information.

5.    The terms of the Operating Agreement between KOVA and Sabin prohibited Sabin from competing with the Company while a Member, and from soliciting any Company clients or prospective clients for a one-year period after his membership interest in the Company ended.

6.    Despite his contractual and fiduciary obligations to the Company, on information and belief, Sabin worked as an independent broker throughout the entirety of his engagement with KOVA and diverted business opportunities away from KOVA.

7.      When Sabin resigned from his position on August 4, 2023, he informed KOVA leadership that he intended to begin immediately competing with the Company and soliciting its clients.

8.      Shortly thereafter, KOVA discovered that Sabin had removed all Company files from his former office. As of the date of this filing, Sabin has refused to return these documents to the Company.

9.      Upon further investigation, KOVA discovered that Sabin had accessed, scanned, and/or emailed to himself numerous Company documents containing highly confidential client and financial information.

10.      Upon information and belief, Sabin engaged in this course of conduct in order to gain a competitive advantage over KOVA.

11.      Furthermore, following his resignation, Sabin has solicited multiple KOVA clients.

12.      Upon information and belief, Sabin has and will continue to use KOVA's confidential and trade secret information to solicit KOVA's customers and improperly divert business for his personal benefit.

## THE PARTIES

13.      Plaintiff KOVA Commercial of Naples, LLC is a limited liability corporation organized under the laws of the State of Florida, with its principal place of business at 9130 Galleria Court, Suite 100, Naples, Florida 34109.

14.    Upon information and belief, Defendant Todd Sabin is an adult resident of Naples, Florida.

## JURISDICTION AND VENUE

15.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, as this matter presents a federal question.

16.    This Court also has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1367.

17.    Sabin is subject to personal jurisdiction in this Court because he is a resident of the State of Florida.

18.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(1).

## FACTUAL ALLEGATIONS

*KOVA's Business and Sabin's Involvement with KOVA*

19.    KOVA is a manager-managed limited liability company and commercial real estate brokerage that operates primarily in Charlotte, Lee, and Collier Counties, Florida.

20.    As a commercial real estate brokerage, KOVA works with clients to buy, lease, sell, or rent nonresidential properties, including but not limited to, office, industrial, land, and retail space.

21.    KOVA's industry is highly reliant on client relationships, and as such KOVA views client information including, *inter alia*, contact information,

transaction information, profit margins, client and potential client requirements and preferences, marketing strategies and plans, referral sources, pricing and commission information, and any hard or electronic documents that contain this information as confidential and trade secret information.

22.    KOVA's client relationships were created and strengthened through great capital and human investment.

23.    KOVA's success is based, in substantial part, on confidential and trade secret information developed and used by KOVA, as well as confidential and trade secret information not disclosed to the general public or to KOVA's competitors.

24.    In or about April 2016, KOVA and Sabin entered into negotiations for Sabin to join KOVA as its Managing/Qualifying Broker and a Member of the Company.

25.    On August 5, 2016, Sabin and KOVA executed the Operating Agreement. Attached hereto as <u>Exhibit A</u> is a true and accurate copy of the Operating Agreement,[1] which has been redacted in accordance with KOVA's Motion for Leave to Redact or, in the Alternative, to File Under Seal, filed on September 1, 2023.  ECF No. 29.

---

[1] Although not a part of the Operating Agreement, for context and completeness of the record, <u>Exhibit A</u> includes a separately executed Non-Competition and Non-Solicitation Agreement.  The Operating Agreement and the Non-Competition and Non-Solicitation Agreement are separate agreements, and KOVA asserts claims in this action only under the Operating Agreement.

26.     Sabin was an active participant in negotiations regarding the Operating Agreement, which lasted several months.

27.     During these negotiations, Sabin and KOVA were not represented by their own individual legal counsel; however, a third-party attorney known to both Sabin and KOVA facilitated their discussions and helped to finalize the terms of the Operating Agreement.

28.     At the time the Operating Agreement was executed, Anthony Emma ("Emma") and Sabin were the sole Members and Managers of the Company. Exhibit A, Art. V, § 6(c), p. 14, Art. VI, § 1, p. 18.

29.     Only Emma made an initial Capital Contribution to the Company; Sabin made no Capital Contribution. Exhibit A, Art. V, § 6(e), p. 15.

30.     Therefore, Emma was a Class A Member, and Sabin was a Class B. Member. Id.

31.     As a Class B Member, per the Operating Agreement, Sabin received a 45% ownership interest in the Company. Id., Art. V, § 7(a), p. 16.

32.     Emma and Sabin were both designated as Managers of the Company. Id., Art. VI, § 1, p. 18.

33.     The Operating Agreement required the Managing Broker to be a Licensed Real Estate Broker and to hold a current and active real estate broker's license in the State of Florida. Id., Art. VI, § 1(a), p. 18.

34.    The Operating Agreement designated Sabin as the initial Managing or "qualifying" Broker. Exhibit A, Art. VI, § 1(a), p. 18.

35.    The Operating Agreement explicitly states that "Sabin's authority as Manager of the Company shall be limited to solely exercising and carrying out those functions for which Florida law requires a Manager to be a Licensed Real Estate Broker." Id.

36.    In his role as Managing/Qualifying Broker, Sabin was primarily responsible for developing a sales team by recruiting, managing, and retaining real estate agents; generating revenue; and ensuring the Company complied with all applicable regulations regarding its real estate operations.

37.    The Operating Agreement explicitly notes that Managers are unauthorized to, *inter alia*, to "[d]o any act in contravention of [the] Operating Agreement[,]" "[d]o any act which would make it impossible to carry on the business of the Company[,]" or "[p]ossess Company property." Exhibit A, Art. VI, § 2(a), p. 20.

38.    Sabin was compensated primarily on a commission basis. In recognition of his managerial responsibilities, Sabin received a more advantageous commission split than any other KOVA real estate agent.

39.    The Operating Agreement also explicitly prohibits Sabin, as a Class B Member, from, *inter alia*, competing with the Company while he held a membership

interest in KOVA by directly or indirectly: (i) working at, being employed by, or having any direct or indirect ownership or profit-sharing interest in any real estate brokerage firm or company located or operating in Collier or Lee County, Florida; (ii) being affiliated in any manner with any other real estate brokerage firm or company located or operating in Collier or Lee County, Florida; or (iii) acting in his individual capacity as a sales associate or broker for any other real estate company or broker in Collier or Lee County, Florida in any manner. Exhibit A, Art. VI, § 8(a), p. 23.

40.    The Operating Agreement also required Sabin, as a Class B Member, to present to KOVA all potential listings or potential purchaser representations in connection with real estate transactions of the type undertaken by the Company. Exhibit A, Art. VI, § 8(b), p. 23.

41.    The Operating Agreement also contains a non-solicitation provision that prohibits Sabin, as a Class B Member, from directly or indirectly soliciting business from clients or prospective clients, enticing clients or prospective clients away from, accepting work involving or otherwise interfering with the relationship of any client or prospective client, during the term of his membership and for one year following the termination of his membership interest in the Company. Exhibit A, Art. VI, § 9(a), pp. 23-24.

42.     During this same period, including for one year following termination, Sabin as a Class B Member is prohibited from directly or indirectly soliciting the services of, or hiring, any individual retained as an independent contractor or who was employed by the Company in the last year, or take any action that results, or might reasonably result, in any individual performing services for the Company to cease performing such services. <u>Exhibit A</u>, Art. VI, § 9(b), p. 24.

***KOVA Takes Measures to Protect its Confidential and Trade Secret Information***

43.     During his engagement with KOVA, KOVA expected Sabin to perform his job duties for KOVA's sole benefit as required by the terms of the Operating Agreement and the nature of his high-level management and membership positions within the Company.

44.     In order to fulfill his responsibilities as Managing/Qualifying Broker, Sabin was entrusted with and had access to KOVA's confidential and trade secret information, including financial information, sales information, strategy information, the identity and lists of actual and potential clients, profit margins, referral sources, client requirements and preferences, and other information regarding services provided to clients.

45.     Sabin was entrusted with this confidential and trade secret information to create and strengthen client relationships for KOVA's benefit.

46.     KOVA takes significant measures to prevent the disclosure of its confidential and trade secret information to competitors and others.

47.     For example, KOVA requires that all real estate agents with access to this information enter into independent contractor agreements: (i) prohibiting the agents from directly or indirectly, disclosing, publishing, transferring, or using, the Company's confidential information; (ii) prohibiting the agents from attempting in any manner to commercially exploit the proposed business concepts and plans of the Company; (iii) prohibiting agents from removing confidential information from the Company's premises; and (iv) requiring the return of any confidential information upon termination of their engagement with the Company.

48.     Attached hereto as Exhibit B is a true and accurate copy of KOVA's template independent contractor agreement in effect in 2022, which has been redacted in accordance with KOVA's Motion for Leave to Redact or, in the Alternative, to File Under Seal.  ECF No. 29.

49.     As the Company's Managing/Qualifying Broker, Sabin was responsible for reviewing independent contractor agreements, including Exhibit B.

50.     As a Member of the Company and its Managing/Qualifying Broker, Sabin was well aware of these confidentiality requirements, that such information was not intended for dissemination or use outside of the Company, and was expected

to adhere to these same policies to protect the Company's confidential and trade secret information.

51.    Sabin was also required to execute an Operating Agreement containing restrictive covenants in order to further protect KOVA's confidential and trade secret information.

52.    The aforementioned confidential and trade secret information were not (and are not) known to the general public, nor did the general public have access to them, and such information belongs to KOVA.

53.    This information is critical to KOVA's economic well-being, and if misappropriated, KOVA's competitors could use this information to gain an economic and competitive advantage over KOVA.

54.    One of the primary objectives of Sabin's position was to help grow KOVA's business, and increase and improve KOVA's goodwill with its clients.

55.    KOVA furthered this objective by encouraging Sabin to develop unique and personal relationships with its clients.

56.    As a result of these relationships, certain clients identified strongly with Sabin and associated KOVA's business with them.

57.    KOVA encouraged these relationships to develop at its expense because by virtue of his position with KOVA, Sabin owed a fiduciary duty to KOVA.

58.     This duty required Sabin to deal fairly with KOVA and protect its business interests.

59.     As a member of KOVA and its Managing/Qualifying Broker, Sabin Sabin also had extensive knowledge of KOVA's relationships with its clients and prospective clients.

*Sabin Failed to Meet His Managerial Responsibilities and Goals*

60.     Throughout his tenure with KOVA, Sabin struggled with his managerial responsibilities and failed to consistently meet the Company's revenue goals.

61.     For example, during his first year as Managing/Qualifying Broker, the Company budget Sabin prepared did not include a line item for revenue. When KOVA senior leadership questioned Sabin about this oversight, he responded in sum and substance that brokerage revenue was too unpredictable to include because "you don't know what transactions you're going to have."

62.     KOVA senior leadership explained that driving revenue was a central aspect of Sabin's position, and that setting and measuring performance against established goals was a key tool in accomplishing this.

63.     Sabin's performance began to markedly decline beginning in or about 2019.

64.     After peaking in 2018, the number of real estate agents working for KOVA began to decrease year after year.

65.     As Managing/Qualifying Broker, a central aspect of Sabin's position was developing KOVA's salesforce.

66.     Revenue also declined in 2021, 2022, and into 2023, with Sabin failing to meet goals, budgets and objectives.

67.     The attrition of agents and Sabin's failure to meet revenue goals were both concerning to KOVA's senior leadership, who consistently counseled Sabin regarding his performance.

68.     In addition to these shortcomings, in early 2023 KOVA senior leadership began to notice a concerning pattern of behavior by Sabin, namely, his engagement in self-interested conduct instead of prioritizing the financial success of the Company and its agents.

69.     For example, between March and June 2023, Sabin was involved in the sale of a property in which he acted to the Company's detriment and to the detriment of the other KOVA real estate agent involved in the transaction.

70.     During this transaction, Sabin represented the seller of the property while another KOVA agent represented the buyer.

71.    As a general practice, KOVA sets a minimum commission for its sales listings as 4% of the sale price with 2% paid to the buyer's agent, and 2% paid to the seller's agent.

72.    This commission may not be changed by individual listing agents without Company approval.

73.    Due to delays in the closing of the transaction, the purchase and sale agreement had to be reissued several times in order to collect timely signatures from both parties.

74.    In the first two versions of the purchase and sale agreement, the commission for the seller's and buyer's agents was set at 1.5% each.

75.    However, in the third and final version of the purchase and sale agreement circulated by Sabin, the total commission on the property was reduced from $50,000 to $30,000 to be paid entirely to Sabin, the seller's agent.

76.    This adjustment was highly unusual as commissions are established when a property is listed for sale and set by the brokerage listing the property: adjusting commission splits during the course of negotiations is highly irregular in the commercial real estate industry.

77.    When Sabin was confronted by the buyer's agent about this change, Sabin (acting as the seller's agent) told the buyer's agent to secure his commission

from his own client. Eventually, Sabin agreed to provide the buyer's agent with 20% of the $30,000 commission.

78.     By reducing the total commission on the sale without KOVA's approval and cutting the buyer's agent out of the transaction, Sabin deprived KOVA of additional revenue it would have received from the transaction.

79.     Upon information and belief, Sabin engaged in this conduct to curry favor with the seller of the property for his own personal benefit and to the detriment of KOVA.

80.     By altering the commission structure in this way, Sabin's commission declined by less than $700 while the commission to the buyer's agent, another KOVA agent, was reduced by approximately $10,000.

81.     On another occasion in or around March 2023, Sabin represented the owner of a commercial property as part of a lease restructure and renewal.

82.     The tenant had become delinquent on its lease and owed approximately $30,000 in lease payments to the owner. Due to associated late fees and other penalties, this amount increased to over $80,000.

83.     Without any input from KOVA, Sabin restructured the lease agreement to forgive over $50,000 in fees, extend the lease by five years, and incorporate the delinquent payments into the new lease term.

84.    Because Sabin received a commission for each lease, during the initial lease term Sabin received a commission on the $30,000, and would receive a second commission on this amount again because it was incorporated into the second lease.

85.    Upon information and belief, in an effort to close the transaction quickly, Sabin attested that he was a witness to the owner's signature on a promissory note associated with the restructuring of the lease when he was not actually present for the signature.

86.    Upon information and belief, Sabin drafted this promissory note himself and only solicited input from an attorney after the terms of the transaction had been agreed to by the parties because he did not want Emma to believe he had "F'd it up."

87.    In light of Sabin's continued managerial deficiencies and the Company's increasing concerns about his self-motivated conduct, KOVA began meeting regularly with Sabin to discuss the immediate need for improvement in his performance.

88.    KOVA leadership also suggested that if Sabin was unwilling to commit to improving his performance, they were open to considering a negotiated departure from the Company by Sabin.

89.    To address the Company's concerns about Sabin's self-interested conduct and provide additional oversight, KOVA appointed Kim Gaglia ("Gaglia")

as an additional Manager of the Company and Managing Broker on June 29, 2023.
*See* Exhibit C, ¶¶ 1-3, Declaration of Kim Gaglia.

90.    Upon her appointment as a Managing Broker, Gaglia became
responsible for, *inter alia*, approving any and all contracts and agreements that
stipulate specific payment amounts or fees payable to the Company, including
listing agreements, referral agreements, buyer/tenant representation agreements, and
purchase and sales contracts, for any transaction Sabin might earn and receive a
payment for. Exhibit C, ¶ 4.

### *Sabin's Resignation and KOVA's Discovery of Sabin's Misappropriation of Confidential and Trade Secret Information*

91.    On Friday, August 4, 2023, Sabin submitted his resignation as
Managing/Qualifying Broker of KOVA, thereby triggering his removal from the
Company as a Member.

92.    To deliver his resignation, Sabin met with Gaglia and Tom Hebble,
V.P., on August 4th at KOVA's corporate headquarters. Exhibit C, ¶ 5.

93.    During this meeting, Sabin stated that he planned to begin competing
with the Company "starting tomorrow[,]" that he would take the position that his
non-solicitation obligations were limited to clients who were clients of KOVA at the
time the Operating Agreement was executed, that he would be operating his own
brokerage, and that he would be contacting other agents and brokerages to inform
them of his new business endeavor. Exhibit C, ¶ 6.

94.    Sabin also stated that he believed that he had to resign before Emma "locks [him] out of the office." Exhibit C, ⁋ 7.

95.    Following his resignation, KOVA learned for the first time that Sabin had registered as a Qualifying Broker for his own real estate brokerage, "Todd T. Sabin, P.A.," in or around April 2017.

96.    Pursuant to the Florida Department of State Division of Corporations, Sabin has operated Todd T. Sabin, P.A. since 2005.

97.    Attached as Exhibit D is a true and accurate copy of the Florida Department of State Division of Corporations' entry for Todd T. Sabin, P.A., available                                                                            at https://search.sunbiz.org/Inquiry/CorporationSearch/SearchResultDetail?inquiryty pe=EntityName&directionType=Initial&searchNameOrder=TODDTSABINPA%2 0P050001604720&aggregateId=domp-p05000160472-65780317-e4f6-4716-8319-dabf83cd7594&searchTerm=TODD%20T.%20SABIN%2C%20P.A.&listNameOr der=TODDTSABINPA%20P050001604720 (last accessed August 20, 2023).

98.    Upon information and belief, Sabin used "Todd T. Sabin, P.A." to provide competitive real estate sales and/or brokerage services during his engagement with KOVA.

99.    Such conduct blatantly violates the Operating Agreement, which prohibits Sabin from working for, being employed by, having any direct or indirect

ownership or profit-sharing interest in, or being affiliated with, any real estate brokerage or company, or acting in his individual capacity as a sales associate or broker for any other real estate company or broker in any manner. *See* <u>Exhibit A</u>, Art. VI, § 8(a), p. 23.

100. On Monday, August 7, 2023, upon arriving at KOVA's corporate headquarters, Emma discovered that Sabin had removed all documents from his office, including the contents of an entire filing cabinet.

101. Prior to his resignation, Gaglia witnessed Sabin loading cardboard boxes into his car. After discovering Sabin's empty office, Gaglia realized Sabin was likely removing all Company documents from his office. <u>Exhibit C</u>, ⁋ 9.

102. KOVA immediately began a forensic investigation into Sabin's activities to determine whether he had removed any other electronic or hard-copy documents belonging to the Company.

103. Although KOVA has not yet completed its investigation, the Company has already discovered numerous instances where Sabin sent to personal or external email addresses documents and communications containing confidential and trade secret information belonging to the Company.

104. For example, on May 11, 2023, Sabin sent the following items to "commercialrealestatenaples@gmail.com" from his Company-issued email account:

a.      Communications regarding the upcoming termination of a commercial lease, assignment of the lease, and additional business opportunities within the building;

b.      Communications regarding a KOVA employee's employment agreement;

c.      Documents pertaining to a highly confidential strategic investment and development plan for a KOVA client that had been developed over a year prior, and which included an investment plan, financial projections, and ownership structure; and

d.      Commercially sensitive and confidential internal KOVA financial documents, including the Company's year-end balance sheet, profit and loss statements, commissions paid to KOVA's real estate agents, and the Company's general ledger.[2]

105.    Sabin sent these emails the same day KOVA management confronted him about his self-dealing in a sales transaction that impacted another KOVA agent as well as the Company.

106.    A week later on May 18, 2023, Sabin sent another email to "commercialrealestatenaples@gmail.com" containing the Company's year-end

---

[2] The documents and communications referenced in Paragraphs 102-108 have been attached as exhibits to KOVA's contemporaneously filed Third Motion for Temporary Restraining Order and for a Preliminary Injunction.

financials along with a summary of a meeting with Karen Martin, Controller, Emma, and Hebble regarding the Company's finances.

107.    The forwarded documents contain highly sensitive Company financial information, including the Company's year-end balance sheet, profit and loss statements, commissions paid to KOVA's real estate agents, and the Company's general ledger.

108.    Sabin also sent a series of emails to, upon information and belief, the email address he used to operate Todd Sabin, P.A. ("toddsabinpa@gmail.com"). These emails include the following:

    a.    On May 11, 2023, Sabin sent himself communications regarding the employment agreement for a KOVA employee;

    b.    On June 6, 2023, Sabin sent himself communications regarding the upcoming termination of a commercial lease, assignment of the lease, and additional business opportunities within the building;

    c.    On June 7, 2023, Sabin sent himself an email containing confidential information for a KOVA property including the identities of the tenants, expiration dates for existing leases, information regarding lease renewal options, and other information that is not publicly available; and

    d.    On June 23, 2023, Sabin sent himself communications and documents regarding a project involving a commercial condominium project

from the owner of a condominium association who had contacted him in his capacity as Managing Broker for KOVA.

109.    Between July 5 and August 4, 2023, Sabin also scanned and sent himself various documents relating to clients for which KOVA and its affiliated property management company performed both brokerage and property management services.

110.    These documents included lease summaries containing confidential information regarding rent amounts, renewal options, and the duration of the lease, lease termination forms, tenant leases, rent rolls, and tenant contact information, among other confidential information.

111.    This information is highly confidential because information regarding lease provisions, renewal options, and the timing of lease terminations is not publicly available and can provide a competitive advantage to others in the commercial real estate industry.

112.    Sabin    had    no    property    management    responsibilities    as Managing/Qualifying Broker and there was no legitimate business reason for him to access and send himself these records.

113.    In the brief time since his departure, Sabin has also solicited multiple KOVA clients. *See* Exhibit C, ¶¶ 10-16.

114.    For example, on August 10, 2023, Gaglia contacted a client to inform it of Sabin's departure from KOVA and to discuss a transition plan. <u>Exhibit C</u>, ⁋ 11.

115.    The client indicated that Sabin had already informed it of his departure, that Sabin had instructed it to send Sabin a letter stating that it wanted Sabin to remain as its listing agent, and that it had followed these instructions. <u>Exhibit C</u>, ⁋ 12.

116.    Such conduct violates the non-solicitation restrictions contained in the Operating Agreement. *See* <u>Exhibit A</u>, Art. VI, § 9, pp. 23-24.

117.    KOVA senior leadership subsequently learned from a client of one of KOVA's affiliates that Sabin contacted them, Sabin informed them of his departure from KOVA, and that he would be operating his own brokerage. <u>Exhibit C</u>, ⁋ 13.

118.    KOVA also discovered that another property for which KOVA had an active listing agreement with an expiration date of March 31, 2024, is no longer listed as an active KOVA listing. <u>Exhibit C</u>, ⁋ 14.

119.    Sabin was the primary leasing agent for this property, and following Sabin's resignation, the client instructed KOVA to remove its signage from the property. <u>Id</u>.

120.    Upon information and belief, Sabin instructed the client to terminate the listing and request the removal of KOVA's signage.

121.    As a result of Sabin's solicitation of KOVA's clients, KOVA has suffered damages resulting from the diversion of business.

122.    Upon information and belief, Sabin intentionally misappropriated KOVA's confidential and trade secret information to gain an economic benefit for himself.

123.    Upon information and belief, Sabin has used KOVA's confidential and/or trade secret information, and is continuing to do so, without the express or implied consent of KOVA, and Sabin knows or should know that he has a duty to maintain this information's secrecy.

**COUNT I**
**BREACH OF CONTRACT**

124.    KOVA incorporates by reference the allegations contained in Paragraphs 1-12, 19-59, and 91-123 as though fully set forth herein.

125.    Sabin knowingly and voluntarily entered into a lawful and enforceable Operating Agreement with KOVA. *See* Exhibit A.

126.    The Operating Agreement contains several restrictive covenants that prohibit Sabin from (a) working for, being employed by, having an ownership or profit-sharing interest in any real estate brokerage firm or company in Collier or Lee County, Florida, or acting in his individual capacity as a sales associate or broker for a real estate company or broker other than KOVA; (b) soliciting, enticing away, or accepting work involving, or otherwise interfering with the relationship of any

Company client or prospective client for one year after his membership interest terminates; or (c) soliciting the services of or hiring any individual employed by the Company within the last year or engaged by the Company as an independent contractor.

127.    The primary purpose of these restrictive covenants is to reasonably protect KOVA's legitimate business interests, including but not limited to (a) the retention of KOVA's current clients, employees, and agents; (b) the preservation of KOVA's trade secrets, confidential information, and/or proprietary information, including information used to assist in the retention of KOVA's current clients, expand business with KOVA's current clients, and secure prospective clients in the future; and (c) the protection of the goodwill KOVA has created with its current clients and prospective future clients.

128.    The scope of the restrictive covenants is reasonable and necessary to protect KOVA's legitimate protectable interests in its confidential, proprietary, and trade secret information, its current and prospective customer relationships, and the goodwill which is part of the same, and these provisions are valid and enforceable.

129.    As set forth herein, upon information and belief, Sabin breached the Operating Agreement and its attendant restrictive covenants by: (1) performing real estate brokerage work as an independent broker throughout his engagement with KOVA; (2) diverting business opportunities and revenue away from KOVA for his

own benefit while a Member of the Company; and (3) soliciting current KOVA clients following the termination of his engagement with the Company.

130. As a direct and proximate result of Sabin's breach of his contractual obligations, KOVA has sustained and will continue to suffer severe competitive harm, irreparable injury, and significant damages, in an amount to be determined at trial.

131. Upon information and belief, if Sabin is not enjoined, he will continue to breach his contractual obligations to KOVA.

132. Because KOVA's remedy at law is inadequate, it seeks, in addition to damages, a temporary restraining order, and preliminary and permanent injunctive relief to prevent any further damage to its business interests and customer goodwill.

## COUNT II
## VIOLATION OF DEFEND TRADE SECRETS ACT, 18 U.S.C. §§ 1832, 1836 *ET SEQ.*

133. KOVA incorporates by reference the allegations contained in Paragraphs 1-12, 19-59, and 91-123 as though fully set forth herein.

134. KOVA maintains and has maintained a vast amount of confidential, proprietary, and trade secret information concerning its business, clients, and prospective clients, KOVA's marketing and growth strategies in the highly competitive commercial real estate industry, and KOVA's knowledge of its existing and prospective client base.

135.   This confidential and trade secret information relates, among other things, to products or services that are used in, or intended for use in, interstate commerce.

136.   KOVA has taken reasonable measures to keep such information secret and confidential.

137.   Agents with access to KOVA's confidential and trade secret information are required to enter into agreements with KOVA: (i) prohibiting the direct or indirect, disclosure, publication, transfer, or use, of the Company's information; (ii) prohibiting any attempts to commercially exploit the proposed business concepts and plans of the Company; (iii) prohibiting the removal of confidential information from the Company's premises; and (iv) requiring the return of any confidential information upon termination of their engagement with the Company.

138.   Due to these security measures, KOVA's confidential and trade secret information is not available for others to use through any legitimate means.

139.   KOVA's confidential and trade secret information derives independent value from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.

140.    Accordingly, KOVA's confidential and proprietary business and client information includes trade secrets pursuant to the Defend Trade Secrets Act, including customer lists, business information, and marketing strategies.

141.    Sabin improperly and unlawfully misappropriated and/or threatened to misappropriate KOVA's trade secret information at a minimum by using his KOVA credentials to access trade secret information while he was concurrently working for KOVA and in his individual capacity as a broker, sending electronic files containing trade secret information to his personal and external email accounts, removing hard copies of documents containing trade secret information from KOVA's corporate headquarters, copying and emailing documents containing trade secret information to himself, retaining KOVA's trade secrets for his own personal benefit, and upon information and belief using KOVA's trade secret information to solicit KOVA clients.

142.    Upon information and belief, Sabin accessed KOVA's systems for the purpose of misappropriating KOVA's trade secrets and using this information for the commercial advantage of Sabin and so that Sabin could compete with KOVA in the commercial real estate industry, so that Sabin would not have to incur the expense and spend the time necessary to develop his own lists of prospective clients and other trade secret information.

143.    Upon information and belief, Sabin's misappropriation of KOVA's trade secret information was intentional, knowing, willful, malicious, fraudulent and oppressive.

144.    Upon information and belief, if Sabin is not enjoined, he will continue to misappropriate and use KOVA's trade secret information for his own benefit and to KOVA's detriment.

145.    As the direct and proximate result of Sabin's conduct, KOVA will suffer and, if Sabin's conduct is not enjoined, will continue to suffer, severe competitive harm, irreparable injury, and significant damages, in an amount to be determined at trial.

146.    Because KOVA's remedy at law is inadequate, it seeks, in addition to damages, a temporary restraining order, and preliminary and permanent injunctive relief to recover and protect its confidential and trade secret information from further use or disclosure.

147.    KOVA is also entitled to an award of exemplary damages and recovery of its attorney's fees incurred herein.

## COUNT III
## VIOLATION OF FLORIDA UNIFORM TRADE SECRETS ACT

148.    KOVA incorporates by reference the allegations contained in Paragraphs 1-12, 19-59, and 91-123 as though fully set forth herein.

149.    KOVA maintains and has maintained a vast amount of confidential, proprietary, and trade secret information concerning its business, clients, and prospective clients, KOVA's marketing and growth strategies in the highly competitive commercial real estate industry, and KOVA's knowledge of its existing and prospective client base.

150.    KOVA has taken reasonable measures to keep such information secret and confidential.

151.    Agents with access to KOVA's confidential and trade secret information are required to enter into agreements with KOVA: (i) prohibiting the direct or indirect, disclosure, publication, transfer, or use, of the Company's information; (ii) prohibiting any attempts to commercially exploit the proposed business concepts and plans of the Company; (iii) prohibiting the removal of confidential information from the Company's premises; and (iv) requiring the return of any confidential information upon termination of their engagement with the Company.

152.    Due to these security measures, KOVA's confidential and trade secret information is not available for others to use through any legitimate means.

153.    KOVA's confidential and trade secret information derives independent value from not being generally known to, and not being readily ascertainable through

proper means by, another person who can obtain economic value from the disclosure or use of the information.

154.    Accordingly, KOVA's confidential and proprietary business and client information includes trade secrets pursuant to the Florida Uniform Trade Secrets Act, including customer lists, business information, and marketing strategies.

155.    Sabin improperly and unlawfully misappropriated and/or threatened to misappropriate KOVA's trade secret information at a minimum by using his KOVA credentials to access trade secret information while he was concurrently working for KOVA and in his individual capacity as a broker, sending electronic files containing trade secret information to his personal and external email accounts, removing hard copies of documents containing trade secret information from KOVA's corporate headquarters, copying and emailing documents containing trade secret information to himself, retaining KOVA's trade secrets for his own personal benefit, and upon information and belief using KOVA's trade secret information to solicit KOVA clients.

156.    Upon information and belief, Sabin accessed KOVA's systems for the purpose of misappropriating KOVA's trade secrets and using this information for the commercial advantage of Sabin and so that Sabin could compete with KOVA in the commercial real estate industry, so that Sabin would not have to incur the

expense and spend the time necessary to develop his own lists of prospective clients and other trade secret information.

157.    Upon information and belief, Sabin's misappropriation of KOVA's trade secret information was willful and malicious.

158.    Upon information and belief, if Sabin is not enjoined, he will continue to misappropriate and use KOVA's trade secret information for his own benefit and to KOVA's detriment.

159.    As the direct and proximate result of Sabin's conduct, KOVA will suffer and, if Sabin's conduct is not enjoined, will continue to suffer, severe competitive harm, irreparable injury, and significant damages, in an amount to be determined at trial.

160.    Because KOVA's remedy at law is inadequate, it seeks, in addition to damages, a temporary restraining order, and preliminary and permanent injunctive relief to recover and protect its confidential and trade secret information from further use or disclosure.

161.    KOVA is also entitled to recovery of its attorney's fees incurred herein.

## <u>COUNT IV</u>
## MISAPPROPRIATION OF CONFIDENTIAL INFORMATION

162.    KOVA incorporates by reference the allegations contained in Paragraphs 1-12, 19-59, and 91-123 as though fully set forth herein.

163.   KOVA possesses confidential information which it protects from unauthorized disclosure, as described in greater detail herein.

164.   Sabin improperly and unlawfully misappropriated KOVA's confidential information at a minimum by using his KOVA credentials to access confidential information while he was concurrently working for KOVA and in his individual capacity as a broker, sending electronic files containing confidential information to his personal and external email accounts, removing hard copies of documents containing confidential information from KOVA's corporate headquarters, copying and emailing documents containing confidential information to himself, retaining KOVA's confidential for his own personal benefit, and upon information and belief using KOVA's confidential information to solicit KOVA clients.

165.   Upon information and belief, Sabin has and will continue to, use and disclose this information in order to gain a competitive advantage over KOVA. In so doing, Sabin has misappropriated KOVA's confidential information, and Sabin's misappropriation was without justification, excuse, or consent.

166.   As the direct and proximate result of Sabin's conduct, KOVA will suffer and, if Sabin's conduct is not enjoined, will continue to suffer, severe competitive harm, irreparable injury, and significant damages, in an amount to be determined at trial.

167.    Because KOVA's remedy at law is inadequate, it seeks, in addition to damages, a temporary restraining order, and preliminary and permanent injunctive relief to recover and protect its confidential information from further use or disclosure.

**COUNT V**
**BREACH OF FIDUCIARY DUTY**

168.    KOVA incorporates by reference the allegations contained in Paragraphs 1-12 and 19-123 as though fully set forth herein.

169.    By virtue of his position with KOVA as a member of a member-managed limited liability company, Sabin owed KOVA fiduciary duties of loyalty and care pursuant to F.S.A. § 605.04091.

170.    These duties include refraining from competing with KOVA in the conduct of the company's activities and affairs; engaging in grossly negligent or reckless conduct, willful or intentional misconduct, or a knowing violation of law; discharging his duties and obligations under the company's operating agreement and exercising any rights consistently with the obligation of good faith and fair dealing; and from appropriating a company opportunity. F.S.A. § 605.04091(2)-(4).

171.    Sabin violated his fiduciary duties to KOVA by, *inter alia*, competing with KOVA while a Member of the Company, engaging in self-interested conduct, diverting business opportunities away from KOVA while a Member of the

Company, and disregarding the clear terms of the Operating Agreement by threatening to solicit KOVA clients and agents and soliciting KOVA clients.

172.    Sabin's misconduct and unfaithfulness to KOVA constitute breaches of his fiduciary duties, requiring forfeiture of all compensation, benefits, and other payments earned during his period of disloyalty and/or resulting from the breaches of his fiduciary duties.

173.    Sabin's breaches have both damaged and irreparably harmed KOVA.

## COUNT VI
## TORTIOUS INTERFERENCE WITH ADVANTAGEOUS BUSINESS RELATIONSHIPS

174.    KOVA incorporates by reference the allegations contained in Paragraphs 1-12 and 19-123 as though fully set forth herein.

175.    KOVA has advantageous business relationships with clients and prospective clients.

176.    KOVA has invested significant time and resources developing and maintaining those relationships.

177.    KOVA's customer base and relationships with its clients and prospective clients were developed over an extensive period of time and at great expense.

178.    KOVA has a reasonable expectancy of maintaining and entering into valid business relationships with its clients and prospective clients.

179.    Because of the high-level managerial position Sabin occupied within the Company, Sabin knew or should have known that customer relationships are critical to KOVA's business and that KOVA has advantageous business relationships with its clients and prospective clients.

180.    Sabin intentionally and unjustifiably interfered with KOVA's advantageous business relationships with its clients and prospective clients, by, *inter alia*, directly and/or indirectly attempting to induce KOVA's clients to sever their relationships with KOVA, disparaging KOVA to its business affiliates, and using KOVA's trade secrets and confidential information, to gain an unfair advantage in the marketplace.

181.    Moreover, Sabin's actions constitute wrongful conduct above and beyond the act of interference itself, including misappropriation of trade secrets and confidential information, breach of contract, and breach of Sabin's fiduciary duties.

182.    Sabin's interference is without justification or privilege, and malicious.

183.    Sabin's actions are ongoing.

184.    As the direct and proximate result of Sabin's tortious interference, KOVA will suffer and, if Sabin's conduct is not enjoined, will continue to suffer, irreparable harm, severe competitive harm, and economic damages including lost profits, loss of business opportunities, and loss of goodwill and competitive advantage, in an amount to be determined at trial.

185.    Because KOVA's remedy at law is inadequate, it seeks, in addition to damages, a temporary restraining order, and preliminary and permanent injunctive relief to prevent any further damage to its business interests and customer goodwill.

## COUNT VII
## DECLARATORY JUDGMENT

186.    KOVA incorporates by reference the allegations contained in Paragraphs 1-12, 19-59, and 91-123 as though fully set forth herein.

187.    Based on the presently known, ascertained or ascertainable facts, there is a bona fide, actual, present, and practical need for a declaration that the non-solicitation covenant contained in the Operating Agreement at Exhibit A, Art. VI, § 9, pp. 23-24 (the "Non-Solicitation Covenant") is valid and enforceable.

188.    Based on the presently known, ascertained or ascertainable facts, there is a bona fide, actual, present, and practical need for a declaration that Sabin is required by law to comply with the terms of the Non-Solicitation Covenant.

189.    Based on the presently known, ascertained or ascertainable facts, there is a bona fide, actual, present, and practical need for a declaration that Sabin is not permitted as a matter of law to solicit, entice, accept work involving, or otherwise interfere with the relationship of any client or prospective client of KOVA for one year.

190.    As a result of Sabin's actions and threatened actions, KOVA has been, is currently being, and will continue to be, damaged and irreparably harmed by

Sabin's past, present, and ongoing violations of the Non-Solicitation Covenant, misappropriation of its goodwill, and misappropriation and unauthorized use and disclosure of the Company's confidential and trade secret information.

191.    KOVA requires this relief in order to stop and prevent any further and ongoing damage or harm.

<u>**COUNT VIII**</u>
**INJUNCTIVE RELIEF**

192.    KOVA incorporates by reference the allegations contained in Paragraphs 1-12 and 19-123 as though fully set forth herein.

193.    As a result of Sabin's actions and threatened actions, including his solicitation of KOVA's clients, misappropriation of and refusal to return KOVA's confidential and trade secret information, and tortious interference with KOVA's advantageous business relationships, KOVA has been, is currently being, and will continue to be, damaged and irreparably harmed.

194.    There is no adequate remedy at law for the conduct described in this Complaint, and the harms described herein are continuous and ongoing.

195.    Given the above facts, KOVA has shown a clear legal right to the requested relief and that there is a substantial likelihood KOVA will succeed on the merits of its claims.

196.    Accordingly, KOVA seeks a temporary restraining order, and preliminary and permanent injunctive relief to prevent any further damage to its

business interests and customer goodwill, and to recover and protect its confidential information and trade secrets from further use or disclosure.

## **PRAYER FOR RELIEF**

Wherefore, KOVA respectfully requests that the Court enter judgment in its favor as follows:

(a)    Enter a Temporary Restraining Order:

1.   Restraining and enjoining Sabin from directly or indirectly using, permitting to be used, disclosing, or transmitting for any purpose any of KOVA's confidential or trade secret information;

2. Restraining and enjoining Sabin from communicating with or otherwise soliciting, either directly or indirectly, accepting business from, or otherwise interfering with any of KOVA's clients or prospective clients, or soliciting KOVA's employees, or agents;

3. Requiring Sabin to return immediately to KOVA all originals, copies, and other reproductions, in any form whatsoever, or any and all documents of KOVA's, including but not limited to copies of any files accessed, copied, downloaded, deleted, opened, or otherwise modified by Sabin and (after preserving all materials in an appropriate manner for purposes of this litigation including metadata) to purge or

destroy any computerized records Sabin has in his possession, custody, or control;

(b)    Enter a Preliminary Injunction Order:

1. Restraining and enjoining Sabin from directly or indirectly using, permitting to be used, disclosing, or transmitting for any purpose any of KOVA's confidential or trade secret information;

2. Restraining and enjoining Sabin from communicating with or otherwise soliciting, either directly or indirectly, accepting business from, or otherwise interfering with any of KOVA's clients or prospective clients, or soliciting KOVA's employees, or agents, for one year;

3. Requiring Sabin to return immediately to KOVA all originals, copies, and other reproductions, in any form whatsoever, or any and all documents of KOVA's, including but not limited to copies of any files accessed, copied, downloaded, deleted, opened, or otherwise modified by Sabin and (after preserving all materials in an appropriate manner for purposes of this litigation including metadata) to purge or destroy any computerized records Sabin has in his possession, custody, or control;

(c)     Order immediate injunctive relief preventing Sabin from activating or otherwise using any devices from which KOVA's systems and/or confidential and trade secret information may have been accessed, as such conduct may spoliate evidence, including metadata, establishing Sabin's misconduct;

(d)     Enter a Permanent Injunction restraining and enjoining Sabin from the conduct set forth above in subparagraphs (b)(1) and (2), except that those provisions shall be in effect for one year from the date of Sabin's confirmed compliance;

(e)     Require Sabin reimburse KOVA for the costs it incurred in obtaining any and all relief in this action, including but not limited to, attorneys' fees incurred by KOVA;

(f)     Award KOVA monetary damages in an amount to be determined at trial, including exemplary damages;

(g)     Award KOVA restitution for any unjust enrichment of Sabin for his violations, in an amount to be determined at trial; and

(h)     Grant KOVA such other and further relief as this Court deems just and proper.

## **JURY TRIAL DEMAND**

KOVA demands a trial by jury of all issues so triable pursuant to Rule 38 of the Federal Rules of Civil Procedure.

Respectfully submitted,

   */s/ Christopher M. Pardo*
Christopher M. Pardo (FL Bar No. 41824)
E-mail: cpardo@huntonak.com
Lawrence DeMeo (admitted *pro hac vice*)
Email: ldemeo@hunton.com
Eileen Henderson (admitted *pro hac vice*)
Email: ehenderson@huntonak.com
HUNTON ANDREWS KURTH LLP
60 State Street, Suite 2400
Boston, MA 02109
Tel: (617) 648-2700

María Alina Castellanos Alvarado (FL Bar. No. 116545)
Email: mcastellanos@hunton.com
HUNTON ANDREWS KURTH LLP
333 SE 2nd Avenue, Suite 2400
Miami, Florida 33131
Tel: (305) 810-2523

*Counsel for Plaintiff KOVA Commercial of Naples, LLC*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the foregoing document was served via the Court's ECF system on September 6, 2023 upon all counsel of record. A courtesy copy of the foregoing will also be provided to counsel of record via electronic mail.

*/s/ Christopher M. Pardo*
Christopher M. Pardo

## <u>VERIFICATION</u>

I declare under penalty of perjury that the foregoing is true and correct.

Executed on September 6, 2023.

_Anthony Emma_
Anthony L. Emma, Jr.
Manager, KOVA Commercial of Naples, LLC