# EXHIBIT A

# KOVA COMMERCIAL OF NAPLES, LLC

## OPERATING AGREEMENT

(a Florida Limited Liability Company)

Dated as of *August 5th*, 2016

**THESE LIMITED LIABILITY COMPANY INTERESTS HAVE NOT BEEN REGISTERED WITH THE SECURITIES AND EXCHANGE COMMISSION UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR UNDER THE SECURITIES LAWS OF ANY STATE IN RELIANCE UPON AN EXEMPTION THEREFROM. THESE SECURITIES HAVE NOT BEEN APPROVED BY THE SECURITIES REGULATORY AUTHORITY OF ANY STATE. THE SALE OR OTHER DISPOSITION OF THE MEMBERSHIP INTERESTS IS RESTRICTED, AS SET FORTH IN THIS OPERATING AGREEMENT, AND THE EFFECTIVENESS OF ANY SUCH SALE OR OTHER DISPOSITION MAY BE CONDITIONED UPON RECEIPT BY THE COMPANY OF AN OPINION OF COUNSEL SATISFACTORY TO THE COMPANY AND ITS COUNSEL THAT SUCH SALE OR OTHER DISPOSITION CAN BE MADE WITHOUT REGISTRATION UNDER THE SECURITIES ACT OF 1933, AS AMENDED, AND OTHER APPLICABLE STATE STATUTES. BY ACQUIRING THE MEMBERSHIP INTERESTS REPRESENTED BY THIS OPERATING AGREEMENT, THE MEMBERS REPRESENT THAT, EXCEPT AS PROVIDED IN THIS AGREEMENT, THEY WILL NOT SELL OR OTHERWISE DISPOSE OF THEIR INTERESTS WITHOUT REGISTRATION OR OTHER COMPLIANCE WITH THE AFORESAID STATUTES AND THE RULES AND REGULATIONS THEREUNDER.**

# OPERATING AGREEMENT
## OF
## KOVA COMMERCIAL OF NAPLES, LLC
### a Florida Limited Liability Company

**THIS OPERATING AGREEMENT OF KOVA COMMERCIAL OF NAPLES, LLC** (this "**Operating Agreement**") is made and entered into as of _____, 2016 ("**Effective Date**"), by and between the undersigned parties.

## RECITALS:

**WHEREAS**, the Members desire to form the Company, pursuant to the provisions of Chapter 605, Florida Statutes, for the purposes set forth herein, and, accordingly, desire to enter into this Operating Agreement in order to set forth the terms and conditions of the business and affairs of the Company and to determine the rights and obligations of its Members.

**WHEREAS,** the Members agree that the rights and obligations of the Members hereunder are contingent upon and shall commence upon the date Sabin (as that term is defined herein) obtains and holds a current and active real estate broker's license in the State of Florida.

**NOW, THEREFORE,** in consideration of the foregoing, the mutual promises of the parties hereto, and of other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledge, the parties hereto hereby agree as follows:

## ARTICLE I
## OFFICE AND PURPOSE

**Section 1.** **Name and Office of the Company.**

a. <u>Name</u>. The name of the Company is "KOVA COMMERCIAL OF NAPLES, LLC".

b. **Office of the Company**. The principal place of business of the Company shall be 1250 Tamiami Tr. N., Suite 101, Naples, Florida 34102. The specified office of the Company at which shall be kept the records required to be maintained by the Company under the Act shall be in the same place.

**Section 2.** **Business of the Company**. The business of the Company shall be to engage in all lawful business activities related or incidental thereto and for any other legal and lawful purpose for which a limited liability company may be organized pursuant to the Act. The primary purpose of the Company, however, shall be to engage in the operation of a real estate brokerage in the State of Florida to be known as "Kova Commercial of Naples, LLC" or such other name(s) as may be decided by the affirmative vote of a Majority in Interest of the Class A

Members from time to time ("**Primary Business**").

## ARTICLE II
## DEFINITIONS

**Section 1.**     **Definitions.**   The following terms used in this Operating Agreement shall (unless otherwise expressly provided herein or unless the context otherwise requires) have the following respective meanings:

a.     **Act**.  The Florida Revised Limited Liability Company Act, as set forth in Section 605.0101, Florida Statutes, et seq., as it may be amended or superseded from time to time.

b.     **Affiliate**. With respect to any Person, any other Person which controls, is controlled by or is under common control with such first Person, and "control" means, with respect to any entity, the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of such entity, whether through the ownership of voting securities, by contract or otherwise.

c.     **Articles of Organization**.  Articles of Organization shall mean the Articles of Organization of the Company filed, or to be filed, with the Florida Secretary of State.

d.     **Budget**. The initial approved Budget of the Company is attached hereto as Exhibit "__".

e.     **Capital Account**.   As of any date the capital account maintained for each Member under Article V, Section 6.

f.     **Capital Contribution**.   The total amount of money and the agreed upon fair market value of property or services contributed to the Company by a Member or his or her predecessor in interest on the date of contribution net of liabilities secured by that contributed property that the Company is considered to assume or to be subject to under Section 752 of the Code.

g.     **Class A Member**.  A Member who owns Class A Units.  Said Member is initially reflected in Article V, Section 6 below.

h.     **Class A Percentage Interest**.  With respect to any Class A Member as of any date, the ratio (expressed as a percentage) of the number of issued and outstanding Class A Units held by such Member on such date to the aggregate number of issued and outstanding Class A Units held by all Class A Members on such date.

i.     **Class A Unit**.  An ownership interest in the Company described in Article V of this Operating Agreement, including any and all benefits to which the holder of such Class A

Unit may be entitled as provided in this Agreement, together with all obligations of such Person to comply with the terms and provisions of this Agreement.

       j.     **Class B Member**.  A Member who owns Class B Units.  Said Members are initially reflected in Article V, Section 6 below. At the time any Class B Member has made a Capital Contribution to the company in an amount equal to said member's Economic Interest in the Company in the then most recent one (1) year period as agreed upon by the Members and as set forth in Section 7 of Article V, said member's Class B Membership interest shall be terminated and said member shall be deed a Class A Member. Should the Members be unable to agree on the value of the Economic Interest of such Class B Member the value shall be determined by an appraiser(s) designated by the Manager(s).

       k.     **Class B Percentage Interest**.  With respect to any Class B Member as of any date, the ratio (expressed as a percentage) of the number of issued and outstanding Class B Units held by such Member on such date to the aggregate number of issued and outstanding Class B Units held by all Class B Members on such date.

       l.     **Class B Unit**.  An ownership interest in the Company described in Article V of this Operating Agreement, including any and all benefits to which the holder of such Class B Unit may be entitled as provided in this Agreement, together with all obligations of such Person to comply with the terms and provisions of this Agreement.  Class B Units shall be subject to such limitations as are set forth in this Operating Agreement.

       m.     **Code**.  The Internal Revenue Code, as amended to date.

       n.     **Company**.  The Company shall be KOVA COMMERCIAL OF NAPLES, LLC, a Florida limited liability company.

       o.     **Distributable Cash**.  All cash, revenues and funds received by the Company from Company operations, less the sum of the following, to the extent paid or set aside by the Company: (i) all principal and interest payments on indebtedness of the Company and all other sums paid to lenders; (ii) all cash expenditures incurred incident to the normal operation of the Company's business including, without limitation, (A) operating expenses, salaries, real and personal property taxes, and insurance, (B) any commissions, marketing fees or other fees relating to the business of the Company, and (C) all other amounts due and owing any third parties in relation to the operation of the Company, including without limitation, any accounting fees, consulting fees and/or attorney's fees; (iii) cash due to a Member in satisfaction of any other loan indebtedness owed by the Company to the Member, if any; provided such loan indebtedness was properly approved by the Members in accordance with this Operating Agreement or otherwise authorized hereunder; (iv) cash due to the Members who have made Contribution Loans, until such time as all Contribution Loans (including accrued interest) have been repaid in full; and (v) any amount which the Administrative Manager may reasonably determine to be necessary as a reserve for operating expenses or contingencies, but not including cost expenditures previously reserved against in a prior fiscal year.

p.    **Economic Interest**.    A Member's economic interest in the Company's Net Profits, Net Losses and distributions of the Company's assets pursuant to this Operating Agreement and the Act, but shall not include any right to participate in the management or affairs of the Company, including the right to vote on, consent to or otherwise participate in any decision of the Members.

q.    **Interest or Percentage Interest**.    The ownership interest expressed as a percentage of a Member in the Company at any particular time with respect to the applicable class of membership, initially as set forth in Article V, including the right of the Member to any and all benefits to which the Member is entitled and the obligations to which the Member is subject under this Operating Agreement.

r.    **Involuntary Withdrawal**. With respect to any Member, the occurrence of any of the following events:

(1)    the Member makes an assignment for the benefit of creditors;

(2)    the Member files a voluntary petition of bankruptcy;

(3)    the Member is adjudged bankrupt or insolvent or there is entered against the Member an order for relief in any bankruptcy or insolvency proceeding;

(4)    the Member files a petition or answer seeking for the Member any reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief under any statute, law, or regulation;

(5)    the Member seeks, consents to, or acquiesces in the appointment of a trustee for, receiver for, or liquidation of the Member or of all or any substantial part of the Member's properties;

(6)    the Member files an answer or other pleading admitting or failing to contest the material allegations of a petition filed against the Member in any proceeding described in Subsections (1) through (5) above;

(7)    any proceeding against the Member seeking reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief under any statute, law, or regulation, continues for one hundred twenty (120) days after the commencement thereof, or the appointment of a trustee, receiver, or liquidator for the Member or all or any substantial part of the Member's properties without the Member's agreement or acquiescence, which appointment is not vacated or stayed for one hundred twenty (120) days or, if the appointment is stayed, for one hundred twenty (120) days after the expiration of the stay during which period the appointment is not vacated;

(8)    if the Member is an individual, the Member's death or adjudication by a court of competent jurisdiction as incompetent to manage the Member's person or property;

Kova Commercial of Naples, LLC
Operating Agreement

(9)    if the Member is acting as a Member by virtue of being a trustee of a trust, the termination of the trust;

(10)    if the Member is a partnership or another limited liability company, the dissolution and commencement of winding up of the partnership or limited liability company;

(11)    if the Member is a corporation, the dissolution of the corporation or the revocation of its article of incorporation or charter; or

(12)    if the Member is an estate, the distribution by the fiduciary of the estate's entire interest in the limited liability company.

s.    **Majority in Interest**.    The holders of a majority of the then-outstanding Membership Interests of any particular or specified class of membership entitled to vote on a particular matter or action.

t.    **Manager**.    A person or persons appointed or elected as Manager or Managers pursuant to Article VI, Section 1.  The term Manager or Managers is intended to correspond to "manager" under the Act.  Initially, Anthony L. Emma, Jr. ("Emma") and Todd Sabin ("Sabin") shall serve as the Managers of the Company and have been allocated specific duties set forth herein in their respective capacities.  The Company shall have not less than one (1) Manager who shall be the holder of a current and active real estate broker's license in the State of Florida (a "Licensed Real Estate Broker"), registered with the Florida Department of Business and Professional Regulation and who shall be referred to herein as the Managing Broker.  Said Managing Broker shall act as the Company's qualifying broker for all real estate services the Company provides unless, upon the affirmative vote of a Majority in Interest of the Class A Members, the Class A Members assign such duties to another Managing Broker who is also a Licensed Real Estate Broker.  The number of Managers of the Company shall be fixed from time to time by the affirmative vote of a Majority in Interest of the Class A Members.  Any Licensed Real Estate Broker acting as a qualifying broker for the Company must be a Manager.  The Company shall have at all times at least one Licensed Real Estate Broker acting as a qualifying broker for the Company and, in the event the Company has just one active broker who resigns, then the vacancy must be filled within fourteen (14) calendar days during which no new brokerage business may be performed by the Company until a Licensed Real Estate Broker is appointed by a Majority in Interest of the Class A Members and registered with the Company.

u.    **Members**.  Any person or entity admitted as Class A or Class B Member, and any additional Member or a Successor in Interest to an existing Member under this Operating Agreement (collectively referred to as the "Members" or individually as "Member").  Initially, Anthony L. Emma, Jr. shall be the Class A Members and Todd Sabin and shall be Class B Member, in the percentages described in Article V, Section 6.c. below.

v.    **Net Profit or Net Loss**.  The profit or loss, as the case may be, of the Company for a period as determined in accordance with Sections 702(a) and 703(a)(1) of the Code, including each item of income, gain, loss or deduction required to be separately stated.

w.    **Officers**.  A person appointed or elected pursuant to Article VI, Section 4. Officers are intended to be the Manager or agents of the Manager (who may be employees of the Company) to whom authority is delegated by the Administrative Manager under the Act.

x.    **Operating Agreement**.  This Operating Agreement, as amended from time to time.  The phrase Operating Agreement is intended to correspond to "Operating Agreement" under the Act.

y.    **Person**.  Any individual, limited liability company, partnership, corporation, trust or other legal entity.

z.    **Successor In Interest**.  The Person who succeeds to an Interest upon the Involuntary Withdrawal or upon the Transfer of an Interest in part or in whole as provided herein.

aa.    **Transfer**.  The sale, assignment, disposition, exchange or other disposition of an Interest, in any manner, whether voluntary or involuntary, or by operation of law or otherwise.

bb.    **Treasury Regulations**.  The Treasury Regulations issued under the Code, as amended from time to time.

cc.    **Unit**.  A measure of a Member's Interest in the Company, depending upon the class of membership.  Each Unit issued and outstanding in the hands of a Member shall represent an equal share of the entire Interest in the profits, losses, capital, ownership and voting in the Company for the applicable class of membership.

**ARTICLE III**
**MEETINGS**

**Section 1**.    **Annual Meetings**.  Unless otherwise decided by resolution of the Members, annual meetings of the Members, or any class of Members, shall not be required.  If held, the Members, or applicable class of Members, shall transact such business as may properly be brought before the meeting.

**Section 2**.    **Regular Meetings**.  Regular meetings of the Members, or any class of Members, may be held at such times and places as the Administrative Manager or the Class A Members shall determine.  At such meetings, the Class A Members shall take such action as may be as may properly be brought before the meeting.

**Section 3.**    **Special Meetings.**  Special meetings of the Members, or any class of Members, for any purpose or purposes, unless prescribed by statute or by the Articles of Organization of the Company, shall be held when called for by the Administrative Manager or when requested in writing by any Class A Member.

**Section 4.**    **Place of Meetings.**   All meetings of the Members, or any class of Members, shall be held at such place within or without the State of Florida as shall be designated in the notice of meeting given pursuant to this Article III or in a duly executed waiver of notice thereof. Members may attend meetings in person, telephone or other electronic means to the extent permitted by Florida law.

**Section 5.**    **Notice of Meetings.**   Whenever Members are required or authorized to take any action at a meeting, a written notice of such meeting, stating the place, day and hour of the meeting and the purpose or purposes for which the meeting is called, shall be delivered no fewer than seven (7) nor more than sixty (60) days prior to the date set for such meeting, either by hand delivery, overnight courier, first class mail or email, to each Member entitled to vote at such meeting.  If mailed, such notice shall be deemed delivered three (3) days after deposit in the United States mail addressed to the Member at its address as it appears on the books of the Company, with first class postage prepaid thereon.  Written waiver by a Member of notice of a Members' meeting, signed by such Member, whether before or after the time stated thereon, shall be equivalent to the giving of such notice.

**Section 6.**    **Consents.**   Personal presence of a Member shall not be required, provided a written consent to or rejection of such proposed action is submitted to the Administrative Manager presiding over the meeting.  Attendance by a Member and voting in person at any meeting shall revoke any written consents or rejections of such Member submitted with respect to action proposed to be taken at such meeting.  Submission of a later dated written consent or rejection with respect to any action shall revoke an earlier one as to such action; provided such later consent or rejection is received prior to such meeting and/or action being taken, whichever is the earlier to occur.  Every consent or rejection must be signed by the Member or an authorized representative of such Member.  All questions regarding the validity of consents or rejections shall be determined by the Administrative Manager presiding over the meeting.

**Section 7.**    **Action by Written Consent.**  Any matter on which the Members , or any class of Members, are authorized to take action under law, the Articles of Organization or this Operating Agreement may be taken by the Members without a meeting assembled if written consents to such action by the Members are signed by the Members entitled to vote upon such action at a meeting which constitutes a Majority in Interest of the Members or such greater or lesser ownership interest in the Company as may be required by law, by the Articles of Organization or by this Operating Agreement for action.

**Section 8.**    **Adjourned Meeting.**    Upon an adjournment of a meeting, it shall not be necessary to give any notice of the adjourned meeting, provided that the time and place to which the meeting is adjourned are announced at the meeting at which the adjournment is taken, and any business which might have been transacted on the original date of the meeting may be

Kova Commercial of Naples, LLC
Operating Agreement

transacted at the adjourned meeting. If, however, after the adjournment, the Administrative Manager presiding at the meeting fixes a new record date for the adjourned meeting, a notice of the adjourned meeting shall be given as provided in Section 5 of this Article to each Member of record on the new record date entitled to vote at such meeting.

**Section 9.** **Member Quorum and Voting.** A Majority in Interest of the Class A Members, represented in person or by written consent, shall constitute a quorum at a meeting of Members, except as otherwise prescribed by law or by the Articles of Organization of the Company. All Class A Members present in person or represented by written consent at such meeting may continue to do business until adjournment, notwithstanding the withdrawal of enough Class A Members to leave less than a quorum, except as prescribed by law or the Articles of Organization. If a quorum is present, the affirmative vote of Majority in Interest of the Class A Members represented at the meeting and entitled to vote on the subject matter shall be the act of the Members unless otherwise provided by law, this Operating Agreement or the Articles of Organization of the Company. All questions regarding the qualification of voters and the acceptance or rejection of votes shall be decided by the Administrative Manager presiding over the meeting.

**Section 10.** **Closing of Transfer Books or Fixing of Record Date.** For the purpose of determining Members entitled to notice of or to vote at any meeting of Members or any adjournment or postponement thereof, or in order to make a determination of Members for any other proper purpose, the Administrative Manager of the Company may provide that the transfer books shall be closed for a stated period, but not to exceed, in any case, ten (10) days. If the transfer books shall be closed for the purpose of determining Members entitled to notice of or to vote at a meeting of Members, such books shall be closed for at least two (2) days immediately preceding such meeting. In lieu of closing the transfer books, the Administrative Manager may fix in advance a date as the record date for any such determination of Members, such date in any case to be not more than one (1) day and, in case of a meeting of Members, not less than ten (10) days prior to the date on which the particular action requiring such determination of Members is to be taken. If the transfer books are not closed and no record date is fixed for the determination of Members entitled to notice of or to vote at a meeting of Members, or Members entitled to receive a distribution, the date on which notice of the meeting is mailed shall be the record date for such determination of Members. When a determination of Members entitled to vote at any meeting of Members has been made as provided in this Section 10, such determination shall apply to any adjournment or postponement thereof.

## ARTICLE IV
## CERTIFICATES OF MEMBERSHIP INTEREST

The Company shall have the power to issue certificates of membership interest in registered form representing ownership of an interest in the Company, whether Class A or Class B Units ("**Certificates**"). The denominations of the Certificates shall be in Units. Each Unit shall represent an equal share in all items of income, loss, distribution and voting with respect to the class of membership in the Company. Subject to the terms hereof, including, without

limitation, any required consents of the remaining Members or other limitations provided herein, Certificates shall be transferable or interchangeable upon presentation at the office of the Company, properly endorsed or accompanied by an instrument of transfer and executed by the Member or his or her authorized attorney, together with the payment of any tax or governmental charge imposed upon the transfer of Certificates. The Company shall replace any mutilated, lost, stolen or destroyed Certificate upon proper identification satisfactory to the Company and payment of any charges incurred in such replacement.

## ARTICLE V
## BOOKS OF ACCOUNT, FINANCIAL
## STATEMENTS AND FISCAL MATTERS

**Section 1.** **Books of Account**. The Manager(s) shall keep adequate books of account of the Company wherein shall be recorded and reflected all of the capital contributions of the Members to the Company and all of the expenses and transactions of the Company. The books of account shall be kept at the principal place of business of the Company located at 1250 Tamiami Tr. N., Suite 101, Naples, Florida 34102, and each Member and his or her authorized representative shall have, at reasonable times during normal business hours, free access to and the right to inspect and, at his or her expense, copy such books of account and all records of the Company, including a list of the names and addresses and Interests owned of each of the Members. All books and records of the Company shall be kept on the basis of an annual accounting period ending on December 31, except for the final accounting period which shall end on the dissolution or termination of the Company without reconstitution.

**Section 2.** **Bank Accounts, Funds and Assets**. The funds of the Company shall be deposited in such bank or banks as the Administrative Manager shall deem appropriate. Subject to resolutions executed and delivered to its banking institutions by the Company through the Administrative Manager, withdrawals from, and checks drawn on, any such account shall be made upon the signature of the Administrative Manager or such other officers as may be designated by the Administrative Manager. Any disbursements or checks drawn on trust or escrow funds held by the Company for the Company's real estate brokerage business shall require the signature of the Managing Broker of the Company.

**Section 3.** **Tax Returns and Reports**.

a.    The Administrative Manager, at the Company's expense, shall cause income tax returns and reports for the Company to be prepared and timely filed with the appropriate authorities.

b.    The Administrative Manager shall also, at the Company's expense, cause to be prepared and timely filed, with appropriate federal and state regulatory and administrative bodies, all reports required to be filed with such entities under the then current applicable laws, rules and regulations. Any Member shall be provided with a copy of any such report upon request without expense to him or her.

Kova Commercial of Naples, LLC
Operating Agreement

    c.     The Administrative Manager shall use its best efforts to cause the Company to deliver to each Member within sixty (60) days after the end of each taxable year the information relating to the Company necessary for the preparation of the Member's federal income tax return.

    d.     Within ninety (90) days after the end of each fiscal year, the Administrative Manager shall deliver to each Member (i) a balance sheet as of the end of such fiscal year, together with related statements of income, Members' equity, and changes in financial position, and (ii) a report of the activity of the Company for such fiscal year.

    e.     <u>Tax Elections</u>.  The Administrative Manager may make all elections for federal income tax purposes.

    f.     <u>Tax Matters Partner</u>.  Anthony L. Emma, Jr. is designated as the "Tax Matters Partner" for purposes of the Code.  The Administrative Manager may name a substitute or successor at any time.

**Section 4**.    **<u>Guaranty of Company Indebtedness or Other Matter</u>**.

    a.     Except as otherwise expressly provided herein, the Members shall not be obligated to guarantee indebtedness or financing of the Company unless they agree to do so in writing. In the event a Member has agreed to such a guarantee and said Member is required to provide financial statements, copies of personal tax returns, or personal guarantees, the Member agrees to do so in a timely manner and on or before the date specified by the Manager.  In the event a loan closing is delayed, or in the event the Company is charged a default fee or increased interest rate as a result of such Member's non-timely response, such Member shall be responsible for payment of all excess charges and increased interest rate.

    b. To the extent any Member has guaranteed any obligation of the Company, the Company agrees to indemnify and hold the Member harmless from and against any claims, demands, losses, damages, liabilities, costs and expenses incurred by the Member pursuant to the guarantee for any rightful obligation of the Company.

**Section 5**.    **<u>No Third Party Beneficiaries</u>**.   The foregoing provisions of this Article are not intended to be for the benefit of any creditor or other person to whom any debts, liabilities or obligations are owed by (or who otherwise has any claim against) the Company or any of the Members, and no creditor or other person shall obtain any right under any of the foregoing provisions or shall by reason of any of the foregoing provisions make any claim in respect of any debt, liability or obligation (or otherwise) against the Company or any of the Members.

**Section 6**.    **<u>Capital Account</u>**.

    a.    **<u>General Provisions</u>**.

(1)    Each Member shall have a separate capital account which shall initially be credited with each Member's Capital Contributions (including prior advances by any Member) and which thereafter shall be credited, charged and otherwise at all times maintained in accordance with the tax accounting principles set forth in Treasury Regulations Section 1.704-1(b)(2)(iv), as those Treasury Regulations may be amended from time to time. The Class A Members or the Administrative Manager shall also make any appropriate modifications to the Capital Accounts in the event that unanticipated events otherwise cause this Operating Agreement not to comply with Treasury Regulations Section 1.704-1(b).

(2)    In the event that any Interest, whether in part or in whole, in the Company is transferred in accordance with the terms of the Company's Articles of Organization or Operating Agreement, the transferee shall succeed to the Capital Account of the transferor to the extent it relates to the transferred Interest.

b.  **Additional Provisions as to Capital and Obligations**

(1)    A Member shall not be entitled to any part of its Capital Account or to receive any distribution from the Company, except as may be specifically set forth in this Operating Agreement or authorized and agreed upon by the unanimous written consent of the Members, or until the full and complete winding up and liquidation of the business and affairs of the Company.







(6)     Except as expressly set forth herein, no interest shall be paid on the initial or any subsequent capital contribution to the Company.

(7)     If there is any basis adjustment pursuant to an election under Section 754 of the Code, then Capital Accounts shall be adjusted to the extent required by this Operating Agreement.

(8)     Except as otherwise provided by the Act, the debts, obligations, and liabilities of the Company, whether arising in contract, tort, or otherwise, shall be solely the debts, obligations, and liabilities of the Company; and the Members, including any Member who is a Manager, shall not be obligated personally for any such debt, obligation, or liability of the Company solely by reason of being a Member.  Failure of the Company to observe any

formalities or requirements relating to the exercise of its powers or the management of its business or affairs under this Operating Agreement or the Act shall not be grounds for imposing personal liability on the Members for any debts, liabilities, or obligations of the Company. Except as otherwise expressly required by law, the Members, in the Members' capacity as Members of the Company, shall have no liability in excess of (a) the amount of such Members' Capital Contributions, (b) such Members' share of any assets and undistributed profits of the Company, and (c) the amount of any distributions required to be returned under Section 605.0711, Florida Statutes.

(9)    Except as otherwise specifically provided herein, no Member may make a withdrawal from its capital account unless all other Members agree to such withdrawal and, except as otherwise provided herein or agreed to by all the Members, all Members shall withdraw amounts in proportion to their respective Interests.

c.    <u>**Names of Members, Classes of Membership and Percentage Interests**</u>.  There shall be two classes of Interests: Class A and Class B.  The holders of each class of Interest shall have such relative rights and duties as set forth in this Operating Agreement. Except as otherwise required by law or by this Operating Agreement, only the holders of Class A Units shall be entitled to vote on, make any determination of, or consent to, any matter to be acted upon by the Members in respect of the Company.  The class of Interest held by each Member and the initial Percentage Interest of each Members is as follows:

<u>Class A Membership</u>

| <u>NAME</u> | <u>ADDRESS</u> | CLASS A <u>UNITS</u> | CLASS A PERCENTAGE <u>INTEREST</u> |
|---|---|---|---|
| Anthony L. Emma, Jr. | 1250 Tamiami Trail N. Naples, FL 34102 | 100 | 100% |

<u>Class B Membership</u>

| <u>NAME</u> | <u>ADDRESS</u> | CLASS B <u>UNITS</u> | CLASS B PERCENTAGE <u>INTEREST</u> |
|---|---|---|---|
| Todd Sabin | 1250 Tamiami Trail N. Naples, FL 34102 | 100 | 100% |

In the event Members are added or deleted, the Interest of each affected Member shall be correspondingly re-calculated.

d.    Additional Issuance of Interests; Additional Classes of Interests.

(1)    In order to create incentives for employees of the Company, raise additional capital, acquire assets, redeem or retire debt of the Company or for any other purpose, the Company may issue Interests in addition to those issued as of the date of this Operating Agreement to any employee, Member or any other Person and may admit any such other Person to the Company as a Member, for the consideration, and on the terms and conditions, determined by the unanimous approval of the Class A Members.

(2)    The Company may issue Units from time to time in one or more classes, or one or more series of such classes, which classes or series shall have, subject to the provisions of applicable law, such designations, preferences and relative, participating, optional or other special rights as shall be fixed by the unanimous approval of the Class A Members, including, without limitation, with respect to: (a) the allocation of items of profit or loss to each such class or series; (b) the right of each such class or series to share in distributions; (c) the rights of each such class or series upon dissolution and liquidation of the Company; (d) the price at which, and the terms and conditions upon which, each such class or series may be redeemed by the Company, if any such class or series is so redeemable; (e) the rate at which, and the terms and conditions upon which, each such class or series may be converted into another class or series of Interests; and (f) the right of each such class or series to vote on Company matters, including matters relating to the relative rights, preferences and privileges of such class or series, if any such class or series is granted any voting rights.

e.    **Initial Capital Contribution**.  The Members shall initially contribute as Capital Contributions to the Company the amount of cash as set forth opposite the name of each:

### Class A Membership

| NAME | INITIAL CAPITAL CONTRIBUTION |
| --- | --- |
| Anthony L. Emma, Jr. | █████ |

### Class B Membership

| NAME | INITIAL CAPITAL CONTRIBUTION |
| --- | --- |
| Todd Sabin | $0.00 |

**Section 7**.    **Profit and Losses**.

a.    The Net Profits and Net Losses of the Company for each Fiscal Year hall be determined in accordance with a generally accepted method of accounting as soon as practicable after the close of the fiscal year of the Company and will be allocated to the Members in

accordance in compliance with applicable tax law and with the percentage allocations set forth below:

| Year of LLC (based upon Effective Date) | Economic Interest Class A | Economic Interest Class B |
|---|---|---|
| Year 1 subsequent years | Fifty-five percent (55.0%) | Forty-five percent (45.0%) |

All items of Company income, gain, loss, deduction, and any other allocations not otherwise provided for in each Fiscal Year shall be divided among the Members in the same proportions as they share Net Profits or Net Losses, as the case may be, for such Fiscal Year.

      b.     Separate capital accounts for each Member shall be maintained throughout the full term of the Company in accordance with the Code and applicable Treasury Regulations. The Members acknowledge that the Code and the Treasury Regulations impose a number of requirements that must be satisfied in connection with allocations made by the Company (including a requirement that, in order for an allocation of an item of income, gain, loss, or deduction to be recognized for federal income tax purposes, the allocation must have "substantial economic effect" or otherwise must be in accordance with the Members' Interests in the Company). It is the intention of the Members that all allocations made under this Operating Agreement shall comply with those requirements and shall be made in manners consistent with Sections 704(b) and 704(c) of the Code and Sections 1.704-1 and 1.704-2 of the Treasury Regulations. In addition to any other steps which may need to be taken to implement that intention, and in connection with certain other special circumstances which might arise, allocations shall be made under the provisions of this Section.

**Section 8.**     <u>Distributions</u>.

      a.     Except as provided herein, all distributions of Distributable Cash or other property shall be made to the Members pro rata in proportion to the respective Economic Interests of the Members on the record date of such distribution at such times as the Administrative Manager shall determine. No Member shall have the right to demand and receive property other than cash irrespective of the nature of the Member's Capital Contribution(s). All amounts withheld pursuant to the Code or any provisions of state or local tax law with respect to any payment or distribution to the Members from the Company shall be treated as amounts distributed to the relevant Member or Members pursuant to this Section. Distributions shall be made at such time as determined by the Administrative Manager in its discretion. Notwithstanding anything herein to the contrary, the Company shall not make, and the Members are not entitled to receive, any distribution from the Company to the extent that such distribution would violate any provision of the Act. Further, no distribution shall be declared and paid unless, after the distribution is made, the assets of the Company are in excess of all liabilities of the Company, except liabilities to Members on account of their Capital Contributions. No Member shall be entitled to interest on such Member's Capital Contribution or to return of the Member's Capital Contribution, except as otherwise specifically provided for herein.

    b.    *Distributions to Pay Tax Liabilities.*  Notwithstanding anything to the contrary as may be contained herein and to enable the Members to pay state and federal income taxes on income of the Company that is taxable to the Members, the Company must make distributions to its Members, in cash, ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████ No distributions may be made under this Section that would violate the restrictions governing distributions under the Limited Liability Company Act of the State of Florida.

**Section 9.** **Acknowledgment by Members**.  All Members are aware of the income tax consequences of the allocations made by this Article and agree by their execution hereof and admittance as a Member to be bound by the provisions of this Article in reporting their share of Net Profits and Net Losses for income tax purposes.

**Section 10.** **Dissolution and Liquidation**.

    a.    Net Profits and Net Losses accruing during the course of the liquidation will continue to be allocated among the Members as set forth in Section 7 of this Article V.  If any assets are distributed in kind, they shall be distributed on the basis of the fair market value thereof as reasonably determined by the Administrative Manager and consistent with the Code and Treasury Regulations, and shall be deemed to have been sold at fair market value for purposes of the allocations.

    b.    In the event of a dissolution and liquidation of the Company, the assets of the Company shall be disbursed in the following order of priority:

    (1)    First, to pay and discharge all the Company's debts and other liabilities not already satisfied, including without limitation, repayment of any institutional loans.

    (2)    Second, to establish a reserve for contingent liabilities of the Company, if any, in an amount agreed to by the vote of a Majority in Interest of the Class A Members.

    (3)    Third, to repay any outstanding Contribution Loan.

    (4)    Fourth, the balance to the Members in proportion to their respective positive Capital Accounts in accordance with Treasury Regulations Section 1.704-1(b)(2)(ii)(b)(2).

    (5)    Lastly, the balance to the Class A Members in proportion to their respective percentage Interests in the Company, unless otherwise agreed upon by the unanimous written consent of the Class A Members.

**Section 11.** <u>**Loans**</u>.   Any Member may, but shall not be required to, make loans to the Company in such amounts, at such times and on such terms as may be approved by the unanimous written consent of the Class A Members.  No such loan shall be considered a Capital Contribution.  The Company shall not loan or advance funds to any Member, nor permit its assets to be encumbered to secure the obligations of a Member, without the prior consent of each of the other Members.

**ARTICLE VI**
**MANAGEMENT OF THE COMPANY**

**Section 1.** <u>**Manager(s)**</u>.   The Company shall be manager-managed under the Act.   The business and affairs of the Company shall be managed by one or more Managers designated by a Majority in Interest of the Class A Members from time to time.  The Members hereby initially designate Anthony L. Emma, Jr. and Todd Sabin as the Managers of the Company.  Management responsibilities and authority of each is allocated to the Managers as specifically described herein.  A Manager need not be a Member.

      a.       <u>Managing Broker/Limitation on Managerial Authority</u>.   The Managing Broker shall be a Licensed Real Estate Broker and will be the holder of a current and active real estate broker's license in the State of Florida, registered with the Florida Department of Business and Professional Regulation.  Initially, Todd Sabin shall act as the Company's qualifying broker for all real estate services the Company provides unless, with the affirmative vote of a Majority in Interest of the Class A Members, the Class A Members assign such duties to another Manager who is also a Licensed Real Estate Broker.  Sabin's authority as Manager of the Company shall be limited to solely exercising and carrying out those functions for which Florida law requires a Manager to be a Licensed Real Estate Broker.  Notwithstanding anything to the contrary herein, Sabin shall have no other authority as a Manager of the Company except as authorized by a Majority in Interest of the Class A Members.   The Administrative Manager shall have be authorized to file with the Florida Department of State one or more Statements of Authority pursuant to the Act to provide public notice of the Managing Broker's authority under this Operating Agreement.

      b.       <u>Administrative Manager</u>.    Emma, as Manager, shall perform only those administrative managerial functions hereunder which do not require a Manager to be a Licensed Real Estate Broker.  Except with respect to any those functions to be carried out by a Licensed Real Estate Broker or otherwise specifically provided, references to the acts, functions or responsibilities to be carried out by a Manager under this Operating Agreement shall mean and refer to solely Emma as Manager.  For purposes of eliminating any confusion on managerial authority, this Operating Agreement sometimes uses the term "Administrative Manager" to refer to certain functions that are intended to be carried out by Emma in his capacity as Manager.

      c.       <u>General Terms</u>.  Except as otherwise provided herein, the Managers shall serve in their respective and specific capacities as Managers until such time as a Majority in Interest of

the Class A Members otherwise designate a replacement or substitute. The Class A Members hereby delegate to the Managers of the Company in their respective and specific capacities as Managers the responsibility for the day-to-day management and ministerial acts of the Company. It is agreed that the general management and final determination of all questions relating to the usual daily business affairs and ministerial acts of the Company shall rest in the Managers of the Company.

Without limiting the generality of the foregoing paragraph, but subject to the provisions of Section 2 of this Article, the Administrative Manager is expressly authorized on behalf of the Company to:

      (a)    Manage the day-to-day operations of the Company, excluding those day-to-day matters which are required to be managed by Managing Broker as Licensed Real Estate Broker;

      (b)    Procure and maintain with responsible companies such insurance as may be advisable in such amounts and covering such risks as are deemed appropriate by the Members;

      (c)    Take and hold any assets of the Company in the Company name, or in the name of a nominee of the Company;

      (d)    Execute and deliver on behalf of and in the name of the Company, or in the name of a nominee of the Company, all contracts, agreements, deeds, leases, checks, evidence of indebtedness, security agreements, financing statements, notes, mortgages and other documents and instruments which are necessary or incidental to the conduct of the Company's day-to-day business and the furtherance of its purpose, or which are necessary, appropriate or convenient to carry out a decision of the Company approved by requisite Percentage Interest pursuant to Section 2 below or as otherwise set forth in this Operating Agreement;

      (e)    Protect and preserve the assets of the Company;

      (f)    Sell, dispose of, trade, exchange, convey, quitclaim, surrender, release or abandon, upon terms and conditions which a Majority in Interest of the Class A Members may approve, personal property of the Company;

      (g)    Execute and deliver documents and instruments on behalf of the Company in connection with the acquisition and disposition of its assets, and to execute, terminate, modify, enforce, continue or otherwise deal with any Company indebtedness and security interests, to sell Company assets, and to take any other action with respect to agreements made between the Company and a lender or any affiliate thereof, all subject to the limitations of Section 2 below;

      (h)    Open Company bank accounts in which all Company funds shall be deposited and from which payments shall be made;

      (i)    Hire and terminate employees or independent contractor of the Company, subject to the limitations set forth in Section 2 below; and

(j)    Invest Company funds and working capital reserves in an interest bearing money market account.

All business arrangements entered into by a Manager shall be on such terms and conditions as generally would be characteristic of a businessman in similar circumstances exercising prudent and sound business judgment.  Each Manager of the Company shall devote such attention, and business capacity to the affairs of the Company as may be reasonably necessary.  In this connection, the parties hereby acknowledge that the Manager of the Company may employ such other persons or entities who have more expertise in the business of the Company.  All such employment and other costs and charges incurred by the Manager shall be paid by the Company.

**Section 2**.    <u>Limitation on Authority of Manager</u>.

a.    Notwithstanding the provisions set forth in Section 1 of this Article VI, without the prior unanimous consent of the Members, a Manager shall have no authority with respect to the Company and this Operating Agreement to do the following:

(1)    Do any act in contravention of this Operating Agreement;

(2)    Intentionally Deleted.

(3)    Sell, lease, refinance or encumber any real property owned by the Company, or purchase any real property to be owned by the Company;

(4)    Sell, exchange or otherwise dispose of all or substantially all of the Company's property and assets;

(5)    Approve the issuance of additional Membership Units;

(6)    Merge the Company with any other entity;

(7)    Do any act which would make it impossible to carry on the business of the Company;

(8)    Possess Company property or assign the right of the Company or its Members in specific Company property for other than a Company purpose;

(9)    Make, execute, or deliver any general assignments for the benefit of creditors, or any bond, guaranty, indemnity bond, or surety bond;

(10)    Assign, transfer, pledge, compromise, or release any claim of the Company in excess of Twenty-Five Thousand and No/100 Dollars ($25,000.00) except for full payment, or arbitrate, or consent to the arbitration of any of its disputes or controversies in excess of Twenty-Five Thousand and No/100 Dollars ($25,000.00);

(11)    Confess a judgment against the Company; or

(12)    Create any personal liability for any Member or Manager other than that personal liability for which any Member or Manager may have agreed to in writing.

b.    Notwithstanding anything in this Operating Agreement to the contrary, no Manager shall perform any duty or function which a Licensed Real Estate Broker is required to perform under Florida law unless and until such Manager is appropriately licensed as a real estate broker by the State of Florida and is otherwise authorized herein. Initially, **Sabin** is the Licensed Real Estate Broker for the Company, and shall act as the Company's qualifying broker for all real estate services the Company provides and, unless and until modified in the manner provided herein, shall be the only Manager authorized to perform any duty or function for the Company which a Licensed Real Estate Broker is required to perform. The Licensed Real Estate Broker shall be responsible for retaining or terminating any Florida licensed real estate agents, whether independent contractor or otherwise.

**Section 3**.    <u>**Election of Officers**</u>.

a.    The Administrative Manager may elect one or more Officers with such titles as they shall determine and delegate to such officers such aspects of the management, conduct and operation of the Company business as the Administrative Manager may determine, subject to any limitations contained in this Operating Agreement, the Articles of Organization and the Act.

b.    Any and all actions permissible by this Operating Agreement, Articles of Organization or the Act, may be executed by the Officer(s) if so delegated by the Administrative Manager.

**Section 4**.    <u>**Execution of Documents**</u>.

a.    Any instrument which is related to the duties of the Manager set forth in this Operating Agreement may be executed and delivered on behalf of the Company by the applicable Manager subject to the following limitations: (i) any and all limitations of Section 2 above and (ii) any instrument that must be executed by the Manager as the qualifying broker of the Company as may be required by Florida Statutes or the rules of the Florida Real Estate Commission may only be executed by the Managing Broker (as Manager) who is the qualifying broker for the Company. Notwithstanding the foregoing and except as provided otherwise in a resolution of the Members, any deed, deed of trust, note or other evidence of indebtedness, lease agreement, security agreement, financing statement, or other instrument purporting to convey or encumber, in whole or in part, any or all of the assets of the Company or of an entity of which the Company is the Manager shall require the signature of the Administrative Manager. All persons may rely thereon and shall be exonerated from any and all liability if they deal with a Manager on the basis of documents approved and executed on behalf of the Company by such Manager.

     b.     Any person dealing with the Company or its Manager(s) or Members may rely upon the certificate signed by any Manager as to:

     (1)     the identity of the Members or Manager(s);

     (2)     acts by the Members or Manager(s); or

     (3)     any act or failure to act by the Company or as to any other matter whatsoever involving the Company or any Member.

**Section 5.**     <u>**Compensation and Reimbursement of Members and Manager(s)**</u>.

     a.     Except as otherwise provided herein, no Member shall receive any compensation for services rendered to the Company in his or her capacity as a Member unless specifically provided.

     b.     The Administrative Manager shall be entitled to charge to the Company, or to be reimbursed by the Company for all reasonable business expenses incurred by the Administrative Manager in connection with Company business and on the Company's behalf, but only to the extent that such costs and expenses were either specifically authorized by the Members of the Company or in the Budget approved by the Members of the Company and incurred in accordance with the written policies reasonably established by the Company.

     c.     The Company shall reimburse the Managing Broker for reasonable, necessary and actual out-of-pocket costs and expenses incurred by the Managing Broker in performance of the Managing Broker's duties, but only to the extent that such cost and expenses were either specifically authorized by the Administrative Manager or in the Budget approved by the Administrative Manager of the Company, incurred in accordance with written policies reasonably established by the Company, and provided that the Managing Broker will furnish the Company with such evidence relating to such expenses as the Company may reasonably require to substantiate such expenses for tax purposes. Notwithstanding the foregoing, the Managing Broker shall not be obligated to make advances for the account of the Company. For purposes hereof, "reasonable, necessary and actual out-of-pocket costs and expenses" described above shall include all reasonable and necessary non-labor related costs advanced by the Managing Broker on behalf of the Company directly related to the duties of the Managing Broker, including without limitation, travel expenses and normal business office expenses. The Managing Broker shall keep reports setting forth the reasonable, necessary and actual out-of-pocket costs and expenses (as described above) incurred by the Managing Broker.

     d.     A Member may be employed by the Company or hired as an independent contractor at the discretion of the Administrative Manager and may be paid a salary or other compensation for services rendered to the Company, and may be reimbursed by the Company for any expenses incurred by the Member in connection with Company business. The salary and/or compensation of such a Member serving as an employee shall be fixed from time to time by the Administrative Manager.

Kova Commercial of Naples, LLC
Operating Agreement

**Section 6.**     **Transfer of Company Property**.  Real or personal property owned or purchased by the Company shall be held and owned, and conveyance shall be made, in the name of the Company.  Instruments and documents providing for the acquisition, mortgage, or disposition of real property of the Company shall be valid and binding upon the Company if executed in accordance with the provisions of Section 4.a. above.

**Section 7.**     **Authority of the Members and Manager(s) to Deal with the Company**.  The Administrative Manager, in its discretion, may engage any person, firm or corporation in which any Member or Manager may have an interest, for the performance of any and all services or purchase of goods or other property which may at any time be necessary, proper, convenient, or advisable in carrying on the business and affairs of the Company or disposing of some or all of its assets; provided, however, that the compensation or price therefor shall not materially exceed that prevailing in arm's length transactions by others rendering similar services on comparable transactions as an on-going activity in the same geographical area as the Property.

**Section 8.**     **Limitations Engaging in Other Businesses**.

        a.     Notwithstanding anything to the contrary in this Agreement and as a condition precedent and material inducement to admitting the Class B Member, the Class B Member agrees and accepts the following restrictions.  For so long as a Class B Member owns an Interest in the Company such Class B Member will not, directly or indirectly, do any of the following: (i) work at or be employed by or have any direct or indirect ownership or profit-sharing interest in any real estate brokerage firm or company located or operating in Collier or Lee County, Florida; or (ii) be affiliated in any manner with any other real estate brokerage firm or company located or operating in Collier or Lee County, Florida, nor shall act, in its individual capacity, as a sales associate or broker for any other real estate company or broker in Collier or Lee County, Florida in any manner.  For a period of one (1) year after the Class B Member has owned an Interest in the Company such Class B Member agrees to be bound by Section 9 below.

        b.     No Member shall be obligated to present any particular investment opportunity to the Company (except that the Class B Member shall refer all potential listings or potential purchaser representations in connection with real estate transactions of the type undertaken by the Company) even if such opportunity is of a character which, if presented to the Company, could be taken by the Company, and each Member shall have the right to take for its own account or to recommend to others any such particular investment opportunity.  Nothing here shall be construed to restrict or limit the Class A Member from establishing, operating, owning an interest in, or being affiliated with other real estate brokerage firms, provided said real estate brokerage firms are not located within Collier County, Florida.

**Section 9.**     **Non-Solicitation.**  Each Class B Member covenants and agrees that for as long as said Member owns a membership interest in the Company (or owns an interest in a legal entity or trust which owns a membership interest in the Company) and for a period of one (1) year thereafter, said Member shall not directly or indirectly do any of the following:

a.      solicit business from, entice away from, accept work involving or otherwise interfere with the relationship of any client or prospective client (including any person or entity that was a client or prospective client of the Company at the time of execution of this Operating Agreement; or

b.      solicit the services of, or hire, any individual who is employed the Company (or who was employed by the Company in the then most recent 1-year period), or who is retained by the Company as an independent contractor, or take any action that results, or might reasonably result, in any individual performing services for the Company to cease performing such services.

The activities described in this Section shall be prohibited regardless of whether undertaken by the Class B Member, or any of the Class B Member's agents or representatives, and regardless of whether performed for the Class B Member's own account or for the account of any other individual, partnership, firm, corporation or other business entity (other than the Company).  If a Class B Member is ever in breach of any of the provisions of this Section, then any time periods applicable to such party as are set forth in this Section shall be extended by the length of time during which such breach existed.

**Section 10.**      **Dealing with Related Persons**.  Without the unanimous consent of all Class A Members, the Manager, on behalf of the Company, may not (i) employ or engage a Member or an immediate family member of a Member to render or perform a service to the Company; or (ii) contract to buy property from or sell property to a Member or an immediate family member of a Member.  For purposes of this paragraph, the phrase "immediate family member" shall mean a parent, spouse, or child.

**Section 11.**      **Indemnification and Exculpation of Members and Manager(s)**.

a.      **Indemnification**.  The Company shall indemnify the Manager(s), or any director, Officer, employee or agent of the Manager(s), for any acts taken within the scope of such person or entity's involvement with the Company.  Each Members shall indemnify and hold harmless the other Member(s) and the Company harmless from and against all claims, demands, losses, damages, liabilities, lawsuits and other proceedings, judgments and awards, and costs and expenses (including, but not limited to, attorneys' fees and expenses) arising out of said Member's actions or business dealings unrelated to the Company.

b.      **Exculpation**.  The Members and Manager(s) shall not be liable to the Company or to any Member for or as a result of any act, omission or error in judgment that was taken, omitted or made in good faith by the Members or Manager in accordance with the Act and this Operating Agreement.  In any proceeding brought or in the right of the Company or brought by or on behalf of Members of the Company, a Member or Manager shall have no liability for damages other than for willful misconduct or a knowing violation of the criminal law.

**Section 12.**      **Deadlock**.

a.    **Definition of a Deadlock**.  A "Deadlock" shall occur if (i) the Managers or the Members become unable to reach agreement on decisions related to material matters and such situation exists for more than thirty (30) days after the initial meeting at which the situation became apparent, or (ii) no quorum is present at two (2) consecutive duly noticed Member meetings.

b.    **Resolution of Deadlock**.  In the event of a Deadlock involving Managers, any Manager by written notice to the other Manager(s) and to the Members, may request the Members resolve the Deadlock by the vote of a Majority in Interest of the Members.  In the event of a Deadlock involving Members (because either (i) the Managers are the same as all Members of the Company, (ii) the Members cannot agree to resolve a Deadlock among the Managers, or (iii) the Members are equally divided (based on their respective Interests or voting rights) over a material matter affecting the operations of the Company and cannot agree to resolve a deadlock), any Member by written notice to the other Members, may initiate the following dispute resolution procedures.  It is mutually agreed by the Company and the Members that any controversy or dispute arising out of or relating to a Deadlock, shall be settled, upon notice by a Member invoking the procedures set forth herein to the other Members.  Such notice shall indicate the issue to be arbitrated and the decision the Member believes should be implemented.  The Members shall first attempt to resolve the matter through mediation with a mediator (i) who is unanimously agreed upon by the Members and (ii) who is an attorney licensed in Florida, certified as a Circuit Court Mediator by the Supreme Court of Florida or such other party as is agreeable to the Members.  The Company shall pay all of the fees for the mediator for serving in said capacity.  If the matter is not settled through mediation or the Members are unable to agree upon a mediator to conduct the mediation, the Member invoking the procedures herein may request that the matter shall be submitted to binding arbitration in accordance with the Florida Arbitration Code ("Arbitration Rules").  The parties shall have fifteen (15) days following the request for arbitration to agree upon an arbitrator.  The controversy or claim shall be submitted to a single arbitrator (who must be an attorney licensed in Florida, certified as a Circuit Court Mediator by the Supreme Court of Florida) mutually agreed upon by the Members.  The arbitration of such dispute will be held within fifteen (15) days after the selection of the arbitrator (the arbitrator shall select the location of the arbitration).  If the Members cannot agree upon an arbitrator within such fifteen (15) day period, such an arbitrator shall be selected in accordance with the arbitration rules through a court of competent jurisdiction within Collier County, Florida.  The Members may, but shall not be required to, submit to the arbitrator and the other Members their position with respect to the issue to be decided prior to the arbitration proceeding.  The arbitrator shall preside over a meeting of the Members' representatives for up to eight hours, after which time, if the Members have not reached a decision as to the matter at issue, or agreed to extend the arbitration proceeding, the arbitrator shall decide the matter, and the arbitrator's decision will be final and binding on the Company and the Members and judgment may be entered upon it in accordance with law in any court of competent jurisdiction.  In the event of any arbitration between Members, each Member shall pay its own costs and expenses, including all reasonable attorneys' fees, court costs and all other costs and expenses incurred by it, and the Company shall pay the arbitrator's fees and costs.

Kova Commercial of Naples, LLC
Operating Agreement

## ARTICLE VII
## TRANSFER OF COMPANY INTERESTS

**Section 1.**  **Assignability of Company Interests**

    a.  **Limitations.**

(1)  Except as otherwise specifically provided herein, no Member may withdraw from the Company without the prior unanimous written consent of the Class A Members. The Members acknowledge and understand, and by their respective execution of this Operating Agreement acknowledge and agree, that due to the limited nature of the primary purpose of the Company and the relationship of the Members, the specific intent of the Members is not to admit substitute Members to the Company except as may be expressly provided herein.

(2)  No principal, member, shareholder, partner, or owner of any corporation, partnership or other entity Member of this Company, either now or in the future may sell, assign or transfer its stock, membership interest, partnership interest or other ownership interest in any corporation, company, partnership or other entity which is now, or hereafter becomes, a Member of this Company, to any person or entity whatsoever, without the prior written consent of all Class A Members, which consent may be withheld in the sole and absolute discretion by such Class A Members. It is the specific intent of the Members that the current individuals involved in this Company, either directly or indirectly as a principal of a Member corporation, company, partnership or other entity, continue to be involved, either directly or indirectly, with this Company, and the Members desire that no other individual become involved with the Company indirectly by acquiring an ownership interest in a Member corporation, company, partnership or other entity without the prior written consent of all Members. In the event any Member, or its principal, violates the foregoing provisions, the Company shall have the right, but not the obligation, to exercise the purchase right, on the terms set forth in Article VIII below, as to the Interest of such Member violating this provision.

(3)  No Member shall be permitted to transfer its Membership Interest without the unanimous written consent of all other Members; provided, however, each Member (subject to subsection (4) below) shall have the right to sell, assign or transfer all or any part of its Interest in the Company to any other Class A Member.

(4)  Notwithstanding the foregoing, in no event shall any transfer, assignment, or bequest be permitted that would cause the Company to be in contravention or violation of any law or regulation, including, but not limited to, the Company's elected tax treatment under the Code. Further, the transfer of any Interest in violation of the limitations set forth herein shall be deemed invalid, null and void, and of no force or effect.

    b.  **Successor in Interest.**

   (1)  Except as otherwise provided above in relation to a transfer to another Member, any Successor in Interest is entitled to the full rights and benefits from ownership of its Interest as a Member in the Company only if all of the following conditions are satisfied:

    (a)  The instrument of transfer sets forth the intention of the transferor that the transferee shall become a Member in place of the transferor with respect to the transferor's Interest.

    (b)  The transferor and transferee shall execute and deliver such other instruments as the Administrative Manager and a Majority in Interest of each class of the Members may require, including written acceptance by the transferee of the terms of the Operating Agreement and the power of attorney in the form described elsewhere herein.

    (c)  The unanimous written consent of the Members to the substitution shall have been obtained, which may be granted or withheld in the absolute discretion of each Member.

    (d)  The transferee shall have paid all reasonable fees and costs incurred by the Company in connection with substitution as a Member, as reasonably determined by the Administrative Manager.

   (2)  To the extent that a Successor in Interest has not met the above requirements provided in Subsection (1) above, such person shall not be considered a Member, and the transferee of the Interest of the Member shall have no right to participate in the management of the business and affairs of the Company or to become a Member.  In the event a Member attempts to sell or convey its Interest in violation of the restrictions described herein, the same shall be deemed a material default hereunder and the remaining Members shall have all the rights and remedies described herein, including without limitation, the purchase rights described below.

  c.  **Pledge or Encumbrance of Interests.**  No Member may pledge or encumber all or any part of its Interest, in any manner, whether voluntarily or involuntarily, by operation of law or otherwise, without the prior unanimous written consent of the Members.


# ARTICLE VIII
## VOLUNTARY WITHDRAWAL, INVOLUNTARY WITHDRAWAL, TRANSFER VIOLATION, DISSOLUTION, AND WINDING UP

**Section 1.**  **Voluntary Withdrawal by Members**.

  a.  **Voluntary Withdrawal by Class A Member**.

   (1)  A Class A Member may not voluntarily withdraw or resign from the

Company without the consent of the other Class A Members.



(2)

     (3)    If a Class A Member nevertheless voluntarily withdraws without the consent required by Section 1.a.(1),

    b.    **Voluntary Withdrawal by Class B Member**.

     (1)    The voluntary withdrawal of a Class B Member may take place at any time upon at least sixty (60) days' prior written notice to the Company. The total amount to be paid for a withdrawn Class B Member's Interest shall be paid within one hundred eighty days after the date of withdrawal.

**Section 2.**    **Mandatory Withdrawal of Class B Member after Termination, Removal or Resignation as Managing Broker.**  It is recognized and acknowledged that the Class B member has been granted its Class B Units in the Company by virtue of the services to be provided to the Company by the Class B Member as Managing Broker.  As such, the Class B Units are

restricted, non-transferrable, subject to forfeiture as described herein. The Class B Member shall be deemed withdrawn from the Company immediately and have no further interest or rights in the Company upon the termination, removal or resignation of the Member as Managing Broker of the Company (for any cause or reason whatsoever), and the Member's Interest then shall be repurchased by the Company as set forth in Section 1.b.(1) above.  In such an event, the Class B Member shall promptly assign and deliver the Interest being transferred to the Company, together with the Member's Certificate(s), if any, and all other instruments and papers necessary and proper to transfer full and complete legal title of such Interest.  Unless the Class A Members agrees in writing otherwise, the voluntary withdrawal of the Class B Member shall immediately terminate the Member's position as Managing Broker hereunder.

**Section 3.**    **Involuntary Withdrawal or Transfer Violation.**

a.    **Withdrawal Offer**.  Except as otherwise may be provided in this Article, upon the Involuntary Withdrawal of a Member or a violation of the transfer restrictions in Article VII by a Member as described herein (the "**Triggering Event**"), the following provisions shall apply.  The entire Interest of the Member (the "**Triggering Member**") in the Company (the "**Withdrawal Interest**") shall be deemed to be immediately offered for sale (the "**Withdrawal Offer**") to the Company.  The Withdrawal Offer shall be and remain irrevocable for a period ending at 11:59 p.m. local time in Naples, Florida on the ninetieth (90th) day following the later of the following: (i) the date of such Triggering Event or (ii) the date upon which the Company and all other non-withdrawing Class A Members become aware of the Triggering Event (the "**Withdrawal Period**").  At any time during the Withdrawal Offer Period, the Company may accept the Withdrawal Offer by notifying the Triggering Member of its acceptance (the "**Withdrawal Notice**").  Neither the Triggering Member nor its Successor in Interest, as applicable, shall be entitled to vote on the question of the Company's acceptance of the Withdrawal Offer, and that decision may be made solely by the unanimous determination of the remaining Members entitled to vote.

b.    **Closing/Withdrawal Purchase Price**.  If the Company accepts the Withdrawal Offer, the Withdrawal Notice shall fix a closing date (the "**Withdrawal Closing Date**") for the purchase, which date shall not be earlier than ten (10) or later than ninety (90) days after the expiration of the Withdrawal Period.  If the Company accepts the Withdrawal Offer, the Company shall purchase the Withdrawal Interest for a price equal to the balance of the withdrawn Member's Capital Account as of the Triggering Event (the "**Withdrawal Purchase Price**").

c.    **Payment of Withdrawal Purchase Price.**  The Withdrawal Purchase Price may be paid (i) in cash or (ii) by promissory note with not less than twenty percent (20.0%) of the Withdrawal Purchase Price paid in cash at closing.  Any part of the Withdrawal Purchase Price not paid in cash at the applicable closing shall be evidenced by a negotiable promissory note executed by the Company providing for interest at an interest rate equal to the Internal Revenue Service short-term Applicable Federal Rate determined under Section 1274(d) of the Internal

Revenue Code for the month in which the transfer occurs, or if such rate is not then in existence, an interest rate equal to five percent (5%) per annum, payable at each installment due date on the unpaid balance of said note. Said note shall also: (1) have no more than a thirty-six (36) month term; (2) provide for acceleration of the due date of the unpaid balance if an installment of principal or interest is overdue for more than (20) days after the due date of same, at the option of the holder; (3) give the Company the option of prepayment in whole or in part of the balance due under said note without any penalty at any time; (4) provide for the payment of reasonable attorneys' fees and costs of collection in the event of default; (5) provide that the payee shall pay any taxes levied against the note or underlying debt evidenced thereby; and (6) shall be secured by the membership interest purchased.

      d.     **Transfer**. Upon payment of the Withdrawal Purchase Price, whether all in cash or partly in cash plus a promissory note, the Triggering Member or the Successor in Interest, whichever is applicable, shall assign and deliver the Interest being so sold and purchased to the Company, together with the selling Member's Certificate(s), if any, and all other instruments and papers necessary and proper to transfer full and complete legal title of such Interest.

      e.     **Failure to Exercise Option to Purchase.** If the Company elects not to accept the Withdrawal Offer for the Interest of the Member who has Involuntarily Withdrawn in the manner conferred by this section, then the Successor in Interest or other legal representative shall be a transferee of the former Member but not admitted, as a substituted Member, except in accordance with Article VII, Section 1., Subsection b. If the Company elects not to accept the Withdrawal Offer for the Interest of the Member violating the transfer restrictions hereunder, no such failure to purchase shall be deemed a waiver of the absolute prohibition and restriction on transferring the Member's Interest, and the Company, the Administrative Manager, and the other Members shall have no obligation to any purported transferee and such purported transferee shall have no right, title or interest in and to the Company or any membership interest therein. Moreover, the failure accept the Withdrawal Offer hereunder shall not be deemed a waiver of the default by the Member violating the transfer restrictions hereunder, and the Company, the Administrative Manager and the remaining Members shall continue to have all rights and remedies available under Florida law, this Operating Agreement and the Articles for such default.

**Section 2.**     **Termination.**

      a.     **Events Causing Dissolution and Winding Up.** Any of the following events shall cause the dissolution and winding up of the Company:

      (1)     Consent in writing by all of the Members.

      (2)     Expulsion, bankruptcy or dissolution of a Member, unless the remaining Members agree to continue the business of the Company pursuant to Subsection b below.

      (3)     Any other event causing dissolution hereunder or under the Act, unless all of the remaining Members agree to continue the business of the Company pursuant to Subsection b below.

b.    **Election to Continue Company.**

(1)    An event set forth in Subsection a above shall not result in the dissolution, winding up and termination of the Company if, within ninety (90) days after the occurrence of that event, the remaining Members elect by unanimous written consent to continue the Company.

(2)    Notwithstanding anything in Subsection a above to the contrary, if the unanimous written consent of the Members required is not obtained pursuant to Subsection b(1), then, on a vote of a Majority in Interest of the Members, the Company's affairs shall not be wound up, and the dissolved Company shall be reconstituted on the terms and conditions of the Operating Agreement.    The Members, including those who do not vote to reconstitute the Company, shall be deemed to continue as Members in the reconstituted Company without payment for the value of their Interest as a result of the dissolution and reconstitution.

c.    **Winding Up Company Affairs.**

(1)    Upon the occurrence of any of the events specified in Subsection a, above, and the failure of the Members to continue the business under Subsection b above, the Administrative Manager shall wind up the affairs of the Company by appointing a liquidating agent who will make a full and general accounting of the assets and liabilities of the Company. After the payment of, or provisions for, all debts of the Company, the proceeds of the sale of the Company assets or the Company assets shall be distributed to the Members in accordance with their Capital Accounts as set forth in Article V, Section 5.

(2)    A reasonable time shall be allowed for the orderly liquidation of the assets of the Company and the discharge of liabilities to creditors so as to minimize the normal losses attendant upon a liquidation; provided, however, that in no event shall the liquidation of the assets of the Company, the payment of creditors, and the distribution of Company assets to the Members occur more than ninety (90) days after the occurrence of the event causing the dissolution of the Company.

(3)    If the Company is "liquidated" within the meaning of Regulation Section 1.704-1(b)(2)(ii)(g), then the liquidating distributions shall be made by the later of (i) the end of the Company taxable year in which liquidation occurs, or (ii)  ninety (90) days after the date of liquidation.

(4)    The Company shall terminate when all assets of the Company have been sold and/or distributed and all affairs of the Company have been wound up.

d.    **Death, Disability or Incapacity of a Member.**

(1)    The death or disability of a Member shall not dissolve the Company. Upon the death or permanent disability of a Member, the interest of the Company shall pass

according to the deceased Member's Will, or to disabled Member's legal guardian ("Substituted Member"), subject to the option set forth below.

(2)    Notwithstanding the foregoing, the remaining Members have the option of purchasing, pro-rata, membership interests of the Member which has suffered death, disability or bankruptcy according to the terms below. Notwithstanding, ownership of membership units jointly by spouses would not be governed by this Section unless both owners of said units shall then be deceased.

(a)    The purchase shall mean, a price equal to 95% of the amount the "Appraised Value" (the "Purchase Price").

The term "Appraised Value" means the appraised value of said member's economic interest in the Company as hereinafter provided. Within fifteen (15) days after demand by either one to the other, the Company and the heirs of the deceased Member shall each appoint an appraiser to determine the value of the equity of the Company's assets. If the two appraisers agree upon the equity value of the Company's assets, they shall jointly render a single written report stating that value. If the two appraisers cannot agree upon the equity value of Company's assets, they shall each render a separate written report and shall appoint a third appraiser, who shall appraise the Company's Assets and determine the value of the equity therein, and shall render a written report of his or her opinion thereon. Each party shall pay the fees and other costs of the appraiser appointed by that party, and the fees and other costs of the third appraiser shall be shared equally by both parties. The equity value contained in the aforesaid joint written report or written report of the third appraiser, as the case may be, shall be the Appraised Value; provided, however, that if the value of the equity contained in the appraisal report of the third appraiser is more than the higher of the first two appraisals, the higher of the first two appraisals shall govern; and provided, further, that if the value of the equity contained in the appraisal report of the third appraiser is less than the lower of the first two appraisals, the lower of the first two appraisals shall govern.

(b)    The Member exercising the option to purchase said membership interest in the Company shall provide written notice of his or her intent to the Substituted Member within sixty (60) days of the death, disability or bankruptcy.

(c)    The purchase price must be paid to the Substituted Member within one hundred eighty (180) days of the date of the death, bankruptcy or disabling event.

## ARTICLE IX
## AMENDMENTS

**Section 1.**     <u>Amendments</u>.   Except as provided by law or otherwise set forth herein, this Operating Agreement may only be amended or modified by a written instrument signed by all Class A Members of the Company entitled and eligible to vote.

## ARTICLE X
## REGISTERED AGENT AND OFFICE

**Section 1.**     <u>Registered Agent</u>.  The Administrative Manager may in its discretion select any person to be the Registered Agent of the Company.   The Registered Agent need not be a Member.

**Section 2.**     <u>Principal Office</u>.  The street address of Principal Office of the company shall be 1250 Tamiami Tr. N., Suite 101, Naples, Florida 34102.  The street address may change from time to time as the Members so desire.

## ARTICLE XI
## MISCELLANEOUS PROVISIONS

**Section 1**.  <u>Miscellaneous Provisions</u>.

     a.     <u>Captions</u>.  Captions contained in this Operating Agreement are inserted only as a matter of convenience and in no way define, limit, extend or describe the scope of this Operating Agreement or the intent of any provision hereof.

     b.     <u>Construction</u>.   Whenever the context may require, any pronouns used herein shall include the corresponding masculine, feminine or neuter forms, and the singular form of nouns and pronouns shall include the plural and vice versa.

     c.     <u>Entire Agreement</u>.   This Operating Agreement embodies the entire agreement and understanding between the Members with respect to the subject matter hereof, and supersedes all prior agreements and understandings between such Members relating to the subject matter hereof.  No amendment, modification, termination or waiver of any provision of this Operating Agreement shall be effective unless the same shall be adopted as set forth herein in writing.

     d.     <u>Governing Law</u>.  This Operating Agreement and the rights and liabilities of the parties shall be determined in accordance with the laws of the State of Florida.

     e.     <u>Interpretation and Severability</u>.  The provisions of this Operating Agreement shall be applied and interpreted in a manner consistent with each other so as to carry out the

purpose and intent of the parties hereto, but if for any reason any provision hereof is determined to be unenforceable or invalid, such provision or such part thereof as may be unenforceable or invalid shall be deemed severed from this Operating Agreement and the remaining provisions carried out with the same force and effect as if the severed provision or part thereof had not been a part of this Operating Agreement.

     f.    **Headings and Subheadings**.  The headings and subheadings in this Operating Agreement are inserted for convenience of reference only and are not to be considered in construction of the provisions hereof.

     g.    **Personal Pronouns**.  In interpreting this Operating Agreement, the singular pronoun shall be deemed to include the plural and the masculine pronoun shall be deemed to include the feminine and neuter as necessary.

     h.    **Personal Representatives**.  The executors, administrators or personal representatives of a deceased Member shall execute and deliver all necessary documents required to carry out the terms of this Operating Agreement.

     i.    **Default/Specific Performance**.  Each Member agrees with the other Members that the other Members would be irreparably damaged if any of the provisions of this Operating Agreement are not performed in accordance with the specific terms and that monetary damages would not provide an adequate remedy in such event. Accordingly, it is agreed that, in addition to any other remedy to which the non-defaulting Member and/or the Company may be entitled, at law or in equity, the non-defaulting Members and/or the Company shall be entitled to injunctive relief to prevent breaches of this Operating Agreement and specifically enforce the terms and provisions of this Operating Agreement in any action instituted in any court of the United States or Florida having subject matter jurisdiction. Therefore, if party hereto, or the executors, administrators or personal representatives of a decedent, shall institute any equitable action or proceeding to enforce the provisions hereof, any person (including the Company) against whom such action or proceeding is brought hereby waives the claim or defense therein that such party or such executors, administrators or personal representatives has or have an adequate remedy at law, and such person shall not urge in any such action or proceeding the claim or defense that such remedy at law exists.

     j.    **Successors**.  Subject to the limits on transferability contained herein, each and all of the covenants, terms provisions and agreements herein contained shall be binding upon and inure to the benefit of the successors, heirs, and assigns of the respective parties.

     k.    **Survival of Representations and Warranties**.  All representations and warranties herein shall survive until the termination of the Company, except to the extent that a representation or warranty expressly provides otherwise.

     l.    **Transfers in Violation of this Operating Agreement**.  In the event any Member transfers or attempts to transfer any Interest other than in accordance with the provisions of this

Operating Agreement, the Company shall have no obligation to recognize such transfer or to record such transfer on the Company's books and records.

      m.    **Waiver**.  No waiver of any breach of this Operating Agreement extended by any party hereto to any other party shall be construed as a waiver of any rights or remedies with respect to any subsequent breach.

**Section 2**.    **Notices**.

      a.    **Addresses**.  Each Member shall keep the other Members informed of his or her current address.  The Members shall have the addresses furnished by the Members on file at the Company office.

      b.    **Communications**.  Any notice, payment, demand, consent, or communication required or permitted to be given by this Operating Agreement shall be in writing and shall be deemed to have been sufficiently given or served for all purposes if delivered personally to the party or to an officer of the party to whom it is directed or if sent by regular U.S. mail (postage and charges prepaid), recognized overnight delivery service, hand delivery, facsimile transmittal, or email.  A notice must be addressed to a Member's last known address or email address contained in the records of the Company.

      c.    **Effective Date of Notices**.  Any notice delivered personally by hand delivery will be deemed given upon delivery or refusal of delivery by the recipient.  A notice that is sent by mail will be deemed given three (3) business days after it is mailed.  A notice sent by recognized overnight delivery service will be deemed given when received or refused.  A notice sent by facsimile shall be deemed given when sent provided the sender has proof of a confirmed transmission.  A notice sent by email will be deemed given went transmitted to the email address in the records of the Company.  Any Member may change the address of that party for purposes of this Operating Agreement by giving the Administrative Manager notice of such change in the manner set forth above.

*(Remainder of Page Intentionally Left Blank.  Signatures Begin on Next Page.)*

Kova Commercial of Naples, LLC
Operating Agreement

IN WITNESS WHEREOF, the Members have executed this instrument as of date set forth on Page 1 of this Operating Agreement.

MEMBERS:

Class A Member:

Anthony L. Emma, Jr.

Class B Member:

Todd Sabin

## ADMINISTRATIVE MANAGER CONSENT AND ACCEPTANCE

The undersigned entity consents to, and accepts, the designation of Administrative Manager on the terms and conditions set forth in the foregoing Operating Agreement as of the date set forth below its signature.

ADMINISTRATIVE MANAGER:

_____
Anthony L. Emma, Jr.

Date:_____8/5/16_____

## MANAGING BROKER CONSENT AND ACCEPTANCE

The undersigned entity consents to, and accepts, the designation of Managing broker on the terms and conditions set forth in the foregoing Operating Agreement as of the date set forth below its signature.

**MANAGING BROKER:**

Todd Sabin

Date: 8/5/16

## NON-COMPETITION AND NON-SOLICITATION AGREEMENT

THIS **NON-COMPETITION AND NON-SOLICITATION AGREEMENT** (this "**Agreement**") is dated this _5TH_ day of _August_, 2016 by between **KOVA COMMERCIAL OF NAPLES, LLC**, a Florida limited liability company ("**Company**") and **TODD SABIN** ("**Sabin**").

WHEREAS, the primary purpose of the Company is to operate as a real estate brokerage; and

WHEREAS, contemporaneously with the execution of this Agreement, Sabin is being issued Units in the Company as set forth in the Operating Agreement; and

WHEREAS, as additional consideration and as additional inducement for the Company to issue Sabin the stated membership interest in the Company and provide various rights to Sabin under the Operating Agreement, Sabin desires to enter into a non-competition and non-solicitation agreement with Company.

NOW, THEREFORE, in consideration of ███████████ the foregoing premises, and the mutual covenants herein contained and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.    **Non-Competition and Non-Solicitation.**  Sabin covenants and agrees that for so long he owns a membership interest in the Company (or owns an interest in a legal entity or trust which owns a membership interest in the Company), Sabin shall not directly or indirectly do any of the following:

a.    work at or be employed by or have any direct or indirect ownership or profit-sharing interest in any real estate brokerage firm or company located or operating in within the Restricted Area (as defined herein); (ii) be affiliated in any manner with any other real estate brokerage firm or company located or operating within the Restricted Area (as defined herein); (iii) act, in its individual capacity, as a sales associate or broker for any other real estate company or broker within the Restricted Area (as defined herein); or (iv) manage, operate, join, control, participate in, be connected with (as an officer, employee, partner, member, shareholder, consultant, lender, investor or otherwise), enter into any agreement reflecting a business transaction with or without any interest (directly or indirectly) in any partnership, company, firm, corporation or any other business organization, person or entity that competes with the Company in the business for which it is engaged.  For purposes of this subsection, "Restricted Area" shall mean Collier County and Lee County, Florida;

b.    In addition, Sabin covenants and agrees that for so long he owns a membership interest in the Company (or owns an interest in a legal entity or trust which owns a membership interest in the Company), and for one (1) year thereafter, Sabin shall not directly or indirectly solicit business from, entice away from, accept work involving or otherwise interfere with the relationship of any client or prospective client (including any person or entity that was a

client or prospective client of the Company as of the Effective Date of the Operating Agreement of the Company; or

        c.      solicit the services of, or hire, any individual who is employed the Company (or who was employed by the Company in the then most recent one (1) year period), or who is retained by the Company as an independent contractor or consultant, or take any action that results, or might reasonably result, in any individual performing services for the Company to cease performing such services.

      The activities described in this Section 1 shall be prohibited regardless of whether undertaken by Sabin, or any of her agents or representatives, and regardless of whether performed for Sabin own account or for the account of any other individual, partnership, firm, corporation or other business entity (other than the Company). If Sabin is ever in breach of any of the provisions of this Agreement, then any time periods applicable to such party as are set forth in this Agreement shall be extended by the length of time during which such breach existed.

      2.      **Enforcement of Agreement**. The Company shall be entitled to all rights and remedies available under Florida law to prevent, prohibit or otherwise cease Sabin's violation of the terms of this Agreement including, without limitation, the right to enforce the terms hereof by specific performance and injunction, and the right to seek any and all resulting damages. Sabin acknowledges and agrees that a claim for damages for breach of the provisions herein contained shall not preclude the Company from seeking injunctive or such other forms of relief as may be obtained in a court of law or equity, and that the Company, in lieu of or in addition to the remedy of damages, may seek injunctive relief prohibiting Sabin from breaching or continuing to breach the provisions of this Agreement. Sabin hereby acknowledges and warrants her experience and capabilities are such that she will be fully able to earn an adequate livelihood for himself or herself and his or her family if this Section should be specifically enforced by the Company.

      3.      **Consideration**. The consideration stated for this Agreement is contractual and not a mere recital.

      4.      **Entire Agreement**. This Agreement and all exhibits mentioned herein or attached hereto, which are hereby incorporated herein by reference, constitute the entire agreement between the parties and supersedes any prior agreements or understandings between them. This Agreement supersedes any and all other agreements, written or oral, between the parties pertaining to the subject matter hereof.

      5.      **Binding Effect**. This Agreement shall be binding on and shall inure to the benefit of the parties, their respective heirs, successor and assigns.

      6.      **Amendment**. This Agreement may be altered or amended only with the prior written consent of the parties hereto.

7.  **Replacement of Invalid Terms**.  It is the desire and intent of the parties that the provisions of this Agreement shall be enforced to the fullest extent permissible under the laws and public policies applied in each jurisdiction in which enforcement is sought.  Accordingly, if any particular term or provision of this Agreement shall be adjudicated to be invalid or unenforceable, the invalid or unenforceable term or provision shall be deemed replaced by a term or provision that is valid and enforceable and that comes closest to expressing the intention of the invalid or unenforceable term or provision.  Any such replacement shall apply only with respect to the operation of this Agreement in the particular jurisdiction in which such adjudication is made.  The remaining terms and provisions hereof shall remain unimpaired.

8.  **Severability**.  Each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement is held to be prohibited by or invalid under applicable law, such provision would be ineffective only to the extent of such prohibition and invalidity, without invalidating the remainder of such provision or the remaining provisions of this Agreement.

9.  **Governing Law and Venue**.  This Agreement, and all other agreements related hereto, shall be construed in accordance with and governed by the laws of the State of Florida.  It is the parties' intent and direction that Florida law shall govern this Agreement and that the venue for any litigation involving this Agreement shall be in Collier County, Florida.

10.  **Arbitration**.  Any dispute or controversy arising under or in connection with this Agreement that cannot be mutually resolved by the parties hereto shall be settled exclusively by arbitration in Naples, Florida before one arbitrator of exemplary qualifications and stature who shall be selected jointly by Company and Individual, or, if Company and Individual cannot agree on a selection, the arbitrator shall be selected by the American Arbitration Association (provided that any arbitrator selected by the American Arbitration Association shall not, without the consent of the parties hereto, be affiliated with Company, Individual or any of their respected affiliates).  Judgment may be entered on the arbitrator's award in any court having jurisdiction.  The parties hereby agree that the arbitrators shall be empowered to enter an equitable decree mandating specific enforcement of the terms of this Agreement.  The expense incurred as a result of such arbitration, including legal fees and out-of-pocket expenses, shall be borne by the non-prevailing party.

11.  **Attorneys' Fees**.  In connection with any litigation, including appellate proceedings, arising out of this Agreement, the prevailing party shall be entitled to recover from the non-prevailing party its costs and expenses, including, without limitation, reasonable attorneys' fees and costs incurred in enforcing its rights and remedies hereunder, including costs of collection prior to instigating and pursuing arbitration, litigation and appeals.

12.  **Joint Work Product**.  The Company and Sabin expressly acknowledge and agree that this Agreement shall be construed as the product of the joint efforts of both parties and that the provisions of this Agreement shall not be construed against the Company as a result thereof.

13.    **Waiver of Jury Trial**.  The Company and Sabin each waive any right to trial by jury in connection with any suit, action or proceeding under or in connection with this Agreement or the business relationship described in this Agreement.

14.    **Counterpart/Facsimile Signatures**.  This Agreement may be executed in several counterparts or by separate instruments, and all of such counterparts and instruments shall constitute one agreement, binding on all of the parties hereto.  Signatures by facsimile or by emailing a signed PDF version of this Agreement shall be deemed valid as original signatures.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date set forth below.


**COMPANY:**                                        **SABIN:**

**KOVA COMMERCIAL OF NAPLES, LLC,**
a Florida limited liability company

                                                    Todd Sabin

By: _____

     Anthony L. Emma, Jr., Manager


Date: ___8/5/16___                          Date: __8/5/16__